The WILKES BARRE PRINTING PRESSMEN AND ASSISTANTS' UNION, NO. 137 I.P.P. & A.E., Plaintiff,

v.

GREAT NORTHERN PRESS, Defendant.

Civ. No. 80–0095.

United States District Court,
M. D. Pennsylvania.

July 8, 1981.

Ira H. Weinstock, Harrisburg, Pa., for plaintiff.

Lewis W. Wetzel, Wilkes-Barre, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. INTRODUCTION

The plaintiff ("Union") filed the instant action on January 28, 1980 seeking monetary and injunctive relief for breach of a collective bargaining agreement. Subject matter jurisdiction rests on Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). *Retail Clerks International Association v. Lion Dry Goods Association*, 369 U.S. 17, 18, 82 S.Ct. 541, 542, 7 L.Ed.2d 503 (1962).[1] The complainant charges that the employer violated two terms of the contract, *viz.*, a pension plan and a union

security clause. The matter was tried without a jury on April 6, 1981. After careful consideration of the evidence and relevant law, the court finds that the defendant transgressed the security provision but not the pension scheme.[2]

### II. FINDINGS OF FACT

Great Northern Press, a printing firm located in Wilkes Barre, is a sole proprietorship owned and operated by Larry N. Llewellyn. In May 1976, the defendant's workers joined the Union. The employer agreed to abide by a collective bargaining agreement based on a model contract between the plaintiff and other printers in the Wilkes Barre area. This compact was set to expire in 1978. Efforts for a successor agreement began during the latter year.

Significantly, the Union did not negotiate directly with Great Northern for a new contract. Rather, the complainant opened discussions with an "Association" of thirteen printing businesses in and around Wilkes Barre. The Union intended that the terms of this arrangement would later be incorporated into separate agreements with other firms, such as Great Northern, which did not belong to the Association and took no part in the actual bargaining. Talks between the Union and the Association continued until 1979. The resulting contract was printed in a bound document known as the "White Book."[3] On August 15, 1979, a representative of the plaintiff named Thomas Dale approached Great Northern and proffered terms for a new contract.

Llewellyn agreed to almost every proposal contained in the White Book. He did, however, have problems with the pension clause which he criticized as too costly for his business. In response, Dale maintained that some sort of pension scheme was crucial. The Union representative explained

---

**1.** The pleadings also allege jurisdiction on the basis of the Employment Retirement Income Security Act ("ERISA"). Throughout this litigation, however, the Union has geared its entire case to the collective bargaining contention and none of its arguments clearly present an ERISA theory.

**2.** The parties have agreed that the court's present discussion should be limited to the issue of liability. The damage question has been reserved.

**3.** The White Book is part of the instant record. *See* Joint Exhibit ("JE") # 2.

that in the event Great Northern would not accept the proposed plan, an alternate could be drafted if: (1) the employees unanimously voted to accept the change, and (2) the new proposal offered comparable benefits to the workers.[4] Llewellyn, nevertheless, insisted that his firm could not provide any such plan for at least another five years. Dale stated that while he was "ninety-nine percent" certain that the Union would demand a pension clause, he would call the national headquarters for verification. Llewellyn then signed page 17 of the White Book, thereby indicating that he had accepted the overall contract. Significantly, Llewellyn did not fill out page 12, which concerned the pension details.[5] Approximately one week later, Dale telephoned Great Northern and stated that his original version of the Union's position on the pension issue was correct. At that point, Llewellyn repudiated the entire agreement. During the months that followed, Great Northern adhered to many provisions of the contract, such as the pay scale. Nevertheless, the union security and pension clauses were not followed.

■ A suit which seeks relief for breach of a collective bargaining arrangement is governed by federal, rather than state, law. *Complete Auto Transit, Inc. v. Reis,* —— U.S. ——, ——, 101 S.Ct. 1836, 1838, 68 L.Ed.2d 248 (1981); *Textile Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957). Yet the court may look to general contract principles and scholarly treatises for guidance as long as the rules they prescribe do not controvert national labor policy. *See Roadway Express, Inc. v. General Teamsters, Chauffeurs and Helpers Union,* 330 F.2d 859, 863–64 (3d Cir. 1964). *See also Local 1330, United Steel Workers v. United States Steel Corporation,* 631 F.2d 1264, 1269–79 (6th Cir. 1980); *Acheson v. Falstaff Brewing Corporation,* 523 F.2d 1327, 1329–30 (9th Cir. 1975). In the in-

stant case, it is necessary to resolve a threshold parol evidence issue before the merits can be considered.

### III. PAROL EVIDENCE

■ As a general rule, parol evidence may not be admitted to vary the provisions of an unambiguous written contract which contains all the items to which the parties agreed. 8 P.L.E. Contracts § 172 (1971). The plaintiff maintains that the White Book constitutes a complete and fully-integrated compact and, for that reason, evidence from outside the "four corners" of the document may not be considered. The court cannot accept this contention. First, Great Northern is not attempting to alter the substance of the collective bargaining agreement. On the contrary, the defendant maintains that no contract ever came into existence. The relevant case law holds that parol evidence may be admitted to bolster this type of claim.

In *Lewis v. Mears,* 297 F.2d 101 (3d Cir. 1962), *cert. denied,* 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962), trustees of a union pension plan sued a mine operator on the ground that the defendant had breached a contractual duty to make payments to the fund that they administered. The employer admitted that he had signed the agreement, but also claimed that according to an oral understanding between the parties, the compact was not binding until the final document was fully-executed and returned to the operator. The defendant contended that he had not incurred any contractual liability, because this condition precedent had never been satisfied. The district court permitted oral evidence on the issue, and the jury found for the employer. The Court of Appeals affirmed. On behalf of a unanimous panel, Judge Kalodner first noted that according to a "well-settled" common law principle, "parol evidence is admissible to prove that a contract did not

---

**4.** Dale testified that the unanimity requirement related to "vesting," presumably under ERISA. He also stated that two members of the Association had signed pension alternatives acceptable to the plaintiff.

**5.** Page 12 will be described in later portions of this Memorandum.

exist." *Id.* at 104. He then stated the following: "In our opinion, national labor policy does not require the exclusion of parol evidence which shows the lack of an effective acceptance of an offer." *Id.* at 105.

Concededly, the precedential value of *Mears* was impaired somewhat by the fact that four judges, half the Court of Appeals, dissented from the decision to deny a rehearing. Speaking for this group, Judge Biggs explained that the federal judiciary had a duty to guarantee that collective bargaining agreements could not become "modified or nullified by covert conditions or stipulations entered into between the employer and the Union." 297 F.2d at 101. On this basis, the dissenters concluded that the operator should not have been permitted to impeach with parol evidence the plain meaning of the written contract. Subsequent authority, however, indicates that the *Mears* rule is still good law, at least on the facts of the instant litigation.

*Lewis v. Seanor Coal Company*, 382 F.2d 437 (3d Cir. 1967) concerned another attempt by a mine operator to overturn a contractual duty to contribute to a pension fund. In essence, the defendant attempted to introduce evidence of a subsequent oral modification to the original collective bargaining agreement. The majority recognized that such a theory might well succeed under traditional common law rules, especially since the written contract was somewhat ambiguous. Yet the Court of Appeals was clearly influenced by the *Mears* dissent. *Seanor* disqualified the parol evidence on the ground that admission:

> would expose employer and union representatives alike to the temptations of corrupt bargains, for it would permit the union to extract from an employer a secret promise to pay some other amount into the fund without requiring such pay-

ments to become a matter of record and thus would frustrate the purpose of the Labor Management Relations Act.

382 F.2d at 443. Significantly, this decision did not overrule *Mears*. Indeed, *Seanor* addressed the latter opinion in these terms:

> We hold . . . that an oral modification which would have suspended the payment of the forty cents per ton royalty into the fund by the employer was ineffective because it violated [the Labor Management Relations Act]. Nothing in our decision in *Lewis v. Mears* forecloses this conclusion. That case held only that *parole [sic] evidence was admissible to show that the written agreement to make payments into a welfare trust never became effective* because it was not fully executed and delivered.

382 F.2d at 443 (footnote and citations omitted, emphasis added).

■ Read together, *Seanor* and *Mears* capsulize the Third Circuit's position on the permissibility of using parol evidence to challenge the stated terms of a collective bargaining agreement. Once the existence of a binding contract has been established, such an offer of proof will be disallowed as part of a general policy to protect workers from collusive oral agreements between management and the union leadership. Yet the narrow holding of *Mears* remains intact, and parol evidence may be employed to show that a document which on its face appears to be a fully-integrated agreement is in fact not a contract.[6] *See also Huge v. Long's Hauling Company*, 590 F.2d 457, 463–65 & n.8 (3d Cir. 1978) (Adams, J., concurring), *cert. denied*, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979). In light of these authorities, the court shall consider Llewellyn's testimony to the extent that it denies the existence of a valid contract.[7]

---

6. This conclusion coincides with the general common law parol evidence rule, which holds that statements made in the negotiation of an agreement may be used to show that a final contract never occurred. Calamari and Perillo, *Contracts* § 42 (1970).

7. Precedents from other circuits support the *Seanor-Mears* rationale. *Food Handlers Local 425 v. Valmac Industries, Inc.*, 528 F.2d 217 (8th Cir. 1975), for example, sanctioned the use of parol evidence to reform a collective bargaining agreement on the basis of misrepresentation. The panel reasoned that the evidence of the dealings between the parties showed

A second factor renders application of the parol evidence rule inappropriate. As already noted, the doctrine only bars oral testimony and other such offers of proof when the document under review is complete and unambiguous. *See* Calamari and Perillo, *Contracts* §§ 40, 50 (1970). *See, generally,* Annot. 40 A.L.R.3d 1384 (1971). *See also* 14 P.L.E. Evidence § 269 at 610–11 (1959). The White Book signed by Llewellyn cannot be considered "fully integrated." As previously noted, the proprietor did not fill out page 12 of the proposed agreement. The passage reads thusly:

## PENSION PLAN

The Employer and the Union hereby accept and ratify and become bound by the terms of that certain Trust Agreement and Retirement Benefit Plan dated October 1, 1955, as amended, establishing the IP&GCU Retirement Fund, the same as though they were signatory parties thereto.

Beginning on January 1, 1973, the employer shall contribute monthly to the IP&GCU Employer Retirement Fund the sum of two dollars ($2.00) for each straight time shift earned to a maximum of five (5) in one week and shall also contribute two dollars ($2.00) for each vacation day paid, and sick leave. Contributions shall be in the manner prescribed by the Retirement Fund Committee. Effective January 1, 1975.

that, because of the fraud, the written document did not embody the real terms of the arrangement and, thus, was not a *bona fide* contract. *Id.* at 218–19. Consequently, relief was granted. *Id.* at 218–19.

*Lewis v. Lowry*, 295 F.2d 197 (3d Cir. 1961), *cert. denied*, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962) is also instructive. There, a union trust fund sued a mine operator for failure to make contributions required by contract. The defendant admitted that he had signed a document agreeing to the payments. The operator, however, argued that the arrangement was "pretensive" in that he and the union knew from the outset that he could not afford the contributions. The district court granted summary judgment on the ground that this parol evidence was irrelevant. The Court of Appeals reversed, and held that the operator's testimony could be permitted to undermine the

It is understood and agreed that the IP&GCU Employer Retirement Fund is and shall remain a qualified pension trust under section 401(A) of the Internal Revenue Code so that the pension contributions provided for herein shall constitute deductible expenses of the

_____

_____

for income tax purposes.

Said contributions shall not be paid for any employee with less than (30) thirty days employment. Should a probationary employee probationary period be extended as provided elsewhere, such contributions shall commence effective the (31) thirty-first day of employment.

*See* JE # 12 at 12. By its own terms, this provision describes the specific entity that would provide the pension payments. No designation, however, is provided. This fact is fully consistent with Llewellyn's testimony that he agreed to all terms of the contract except the pension scheme. The terms of the document, therefore, are hardly incontrovertible. Therefore, the parol evidence rule does not apply. *Clancy v. Recker*, 455 Pa. 452, 459, 316 A.2d 898 (1974).

## IV. THE MERITS

■■ Certain principles must be kept in mind during assessment of the merits. First, a collective bargaining agreement

contract as "pretensive." The majority explained:

> If . . . it should be made to appear that the union, for the sake of its relations with the larger mine operators, or for any other reason, insisted upon execution by the small operator of an agreement which in fact was pretensive and not the real agreement of the parties, nothing appears in the federal statutes which would prevent disclosure and proof of the real agreement between the union and the mine operator.

295 F.2d at 199. On remand, however, the evidence demonstrated that the contract was not a sham, but that the defendant was merely attempting to alter the payment terms of an otherwise valid contract. The Court of Appeals, therefore, declared that the evidence was inadmissible. *See Lewis v. Lowry*, 322 F.2d 453, 456 (4th Cir. 1963) (*en banc*).

may be binding even if all or some of its terms are unwritten. *Kaylor v. Crown Zellerbach, Inc.*, 643 F.2d 1362, 1367 (9th Cir. 1981); *National Labor Relations Board v. Haberman Construction Company*, 641 F.2d 351, 355–56 (5th Cir. 1981) (*en banc*). Thus, Llewellyn's failure to fill out page 12 of the White Book does not in itself undermine the union's position on the pension issue, even if such a signature would normally memorialize consent. Second, labor agreements are governed by the "objective theory" of contracts. In other words, the central inquiry for the court is whether the actual conduct of Dale and Llewellyn would have manifested offer and acceptance to a reasonable observer, regardless of the subjective intent of the negotiators. *General Warehousemen and Employees Union, Local No. 636 v. J. C. Penney Company*, 484 F.Supp. 130, 135 (W.D.Pa.1980) (Snyder, J.).[8]

## A. The Pension Provision

■ Three factors bolster Llewellyn's claim that he never accepted the terms of the pension clause. First, the proprietor clearly informed Dale that the provision was unacceptable to Great Northern. The Union representative, therefore, had notice that Llewellyn did not consider his signature on page 17 to manifest assent to the pension scheme.

Second, the proprietor refused to complete page 12 of the White Book. The court has already explained that this fact by itself does not decide the issue. When viewed in the context of the actual situation, nevertheless, the development is of considerable significance. Page 12 contained important information which an employer who agreed to the union pension clause would fill out in order to obtain a tax advantage. For this reason, a firm which assented to the arrangement would normally be expected to place the appropriate statement in the designated blanks. On the stand, Dale conceded that the printers who adopted the provision signed the page. The plaintiff, moreover, submitted evidence that any firm which established an alternate scheme acceptable to the Union blacked out the twelfth page of the White Book.[9] Accordingly, Llewellyn's refusal to sign the provision separately was a strong objective indicator of his refusal to adhere to the pension plan.

Finally, the situation as it existed on August 15th was such that neither side should have considered the issue closed. While Dale said he was "ninety-nine percent sure" that the Union would not offer a further compromise on the matter, he agreed to verify his position with national headquarters. Thus, Llewellyn did not have reason to believe that his decision to sign page 17 would manifest consent to the plaintiff's pension demands, which were conceivably subject to change. Rather, the totality of these circumstances, e. g., the proprietor's oral statements, the refusal to complete page 12, and Dale's offer to verify the Union's terms, clearly indicated that the parties had not reached the degree of objective agreement necessary to finalize a contract, at least with regard to the pension issue which was undeniably in a state of flux.

## B. The Union Security Provision

■ The union security question presents the court with a more difficult problem. The clause reads in relevant part:

### JURISDICTION AND UNION SECURITY

1. It is understood that this contract applies to the union pressrooms operated

---

**8.** *See also National Labor Relations Board v. Haberman Construction Company*, 641 F.2d at 356 ("... what is required is conduct manifesting an intention to abide by the terms of an agreement."); *Hospital and Institutional Workers Local 250 v. Pasatiempo Development Corporation*, 627 F.2d 1011, 1012 (9th Cir. 1980) (explaining that the existence of a collective bargaining agreement hinges on "an objective manifestation of ... agreement....").

**9.** *See* Plaintiff's Exhibit # 1. This document is a White Book memorializing the collective bargaining agreement between the Union and Unigraphic, a firm which had its own pension alternative. Page 12 is crossed out.

by the Employer, and that the jurisdiction of this contract extends over all printing presses employed in said pressrooms, including, but not limited to gravure, offset and letterpress printing presses and associated devices, all work in connection with offset platemaking, including camera operation, all darkroom work, stripping, lay-out, opaquing and platemaking. It shall be a condition of employment that all employees of the Employer covered by this agreement who are members of the Union in good standing on the effective date of this agreement, shall remain members in good standing, and those who are not members on the effective date of this agreement shall, on the thirtieth day following the effective date of this agreement, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this agreement and hired on or after its effective date shall, on the thirtieth day following the beginning of such employment, become and remain members in good standing in the Union.

2. In order to prevent any misunderstanding of the above language, an employee shall become a member of the Union (30) thirty days after date of employment irrespective of the number of days actually worked during this period.

See JE # 2 at 4–5. Superficially, Great Northern's "objective" manifestation of consent seems evident, since Llewellyn signed page 17 and orally indicated assent to all of the Union's terms other than the pension arrangement.[10] Yet one issue must be resolved before the controversy can be finally determined, viz., whether the fact that the pension question was left open prevented the remainder of the White Book terms from forming a binding contract.

*Roadway Express, Inc. v. General Teamster, Chauffeurs and Helpers Union* concerned a collective bargaining agreement which was worked out in stages. The employer contended that on June 15, 1961, the parties had agreed to a general contract which covered wages, work hours, and other conditions of employment. Significantly, the arrangement incorporated a promise by the union to refrain from striking throughout the duration of the compact. The negotiators, moreover, agreed that one important issue, i. e., the terms under which a truck driver deserved the assistance of a helper, would remain open pending further discussions. During the following August, the union called a work stoppage on the helper question. The employer then sued alleging breach of the no-strike clause. The district judge granted summary judgment in favor of the defendant, but the Court of Appeals for the Third Circuit reversed. In a unanimous decision, the *Roadway* panel conceded that the terms reached on June 15th left an important dispute unresolved. The court, however, ruled that whether the matters on which there was agreement constituted a binding contract "was a question of fact" to be determined at trial. 330 F.2d at 864.

In *National Labor Relations Board v. Beckham, Inc.*, 564 F.2d 190 (5th Cir. 1977), the Court of Appeals for the Fifth Circuit accepted the *Roadway* rationale. The case involved a labor contract which left two items unresolved: the "formation of a joint trade board" and establishment of "residential rates."[11] The employer retracted its initial acceptance of the agreement. The National Labor Relations Board found that this action constituted an unfair labor practice. On appeal, the corporation contended that the collective bargaining agreement was invalid as incomplete. The panel,

---

**10.** At the trial, Llewellyn admitted that he took a rather cavalier attitude toward the terms of the collective bargaining agreement and never read most of the provisions. Under the "objective" theory of contracts, nevertheless, the proprietor's mental impressions are not controlling. The court shall find the security clause part of the binding contract if Llewellyn's signature on page 12 can be fairly characterized as a manifestation of consent to the clause. *General Warehousemen and Employees Union Local 636 v. J. C. Penney Company*, 484 F.Supp. at 135.

**11.** The opinion gives no further details as to the nature of these issues.

nevertheless, upheld the N.L.R.B. on the following basis:

> We understand that labor negotiators often reach agreement on a new contract (frequently under the gun of a strike deadline) by agreeing on the essential terms and agreeing to discuss other details at a future time. *So long as both parties in a labor negotiation intend their agreement to be final, they may leave other issues open for future resolution without impairing the binding effect of that agreement.*

*Id.* at 195 (emphasis added).

In light of these precedents, this court must review the facts of the instant case to determine the intent of the parties on August 15, 1979. If Dale and Llewellyn agreed that the signing of the White Book finally settled all issues other than the pension question, which was reserved to a later time, then they established a binding contract which Great Northern subsequently breached when it repudiated the union security clause. Conversely, if the negotiators intended that their concurrence on the other matters was only tentative and contingent upon settlement of the pension controversy, then the collective bargaining agreement was incomplete and unenforceable in all respects. *National Labor Relations Board v. New York-Keansburg Long Branch Bus Co., Inc.*, 578 F.2d 472, 476–83 (3d Cir. 1978); *United Steelworkers v. Rome Industries, Inc.*, 321 F.Supp. 1170, 1174–75 (N.D.Ga.1970), *aff'd*, 437 F.2d 881, 883 (5th Cir. 1970).[12] In making this determination, the court must again look to the "objective manifestations" of the proprietor and the Union representative. Several indicia demonstrate the existence of a contract.

Initially, the relevant case law holds that the number and nature of items on which the parties concurred is very important. *Roadway* and *Beckham*, for example, concerned broad arrangements in which only one or two manageable issues remained open. In such a situation, it is usually reasonable to believe the negotiators considered the proposed contract binding, since the remaining controversies are limited and, in all probability, capable of resolution without disruption of the overall management-labor relationship. In *New York-Keansburg*, on the other hand, the parties continued to dispute four fundamental issues, including a part-time employee clause which was "essential" to any stable agreement. The Court of Appeals found it "inconceivable ... that a full and complete agreement ready for signature had been effected without resolution of an issue as vital as [that] one." 578 F.2d at 481 (footnote omitted). As already explained, Llewellyn indicated to Dale that Great Northern would accept *all* provisions of the White Book other than the pension scheme. Examination of the terms on which concurrence existed demonstrates that they are indeed comprehensive, covering wages, overtime, union security, vacations, apprentice and journeymen training, work details, sick leave, a grievance procedure, and other important matters. Given the narrowness of the disagreement between Great Northern and the Union, the instant case more closely resembles *Beckham* than *New York-Keansburg*.

Second, the manner in which Llewellyn signified his assent to the terms other than the pension clause is very important. If the proprietor had informed Dale that his general concurrence was contingent upon resolution of the pension matter, then his actions could not have manifested final consent to any of the White Book provisions. The proprietor, however, actually signed page 17, thereby permanently memorializing his assent. This action would certainly justify an objective observer to conclude that Llewellyn's acceptance of the general terms was unequivocal, especially since his objections were strictly limited to the question of pensions and did not reach the overall union-management relationship. Again, the facts of this case fall within the reasoning of *Beckham*.

---

12. As Chief Judge Seitz explained on behalf of the panel in *United Mine Workers v. Barnes & Tucker Company*, 561 F.2d 1093, 1097 (3d Cir. 1977), "Courts will not enforce a settlement agreement that is vague, ambiguous, incomplete, or unclear in its meaning and effect."

Finally, it must be remembered that a collective bargaining situation is not a traditional arms-length transaction where the parties are free to scuttle an agreement at any time prior to finalization of the contract. On the contrary, both union and management are subject to a continuing duty to negotiate in good faith and resolve all issues which can be settled amicably. *Glomac Plastics, Inc. v. National Labor Relations Board*, 592 F.2d 94, 97–98 (2d Cir. 1979). Thus, the mere fact that the two sides may have initially appeared intransigent on the pension issue did not detract from the obligation that each had to keep working for a compromise. This responsibility to bargain in good faith adds further support to the theory that a contract came into existence on August 15th. Since Great Northern and the Union knew, or should have known, that they had an obligation to reach a final agreement if possible, it was all the more reasonable for Dale to believe that Llewellyn's reservations on one aspect of the White Book was not necessarily fatal to the overall contract, particularly the provisions which the proprietor clearly accepted.

### V. CONCLUSION

In summary, the court has made two findings. First, the defendant is not liable to the plaintiff for damages under the pension provision, because a binding contract never existed on that issue. Second, Great Northern did violate the union security clause and is responsible for the resulting injury. Only one matter remains unresolved: the proper remedy. Within twenty (20) days of the receipt of this Memorandum and Order, the parties shall inform the court if they can settle the matter. If not, then the plaintiff shall submit a brief and supporting documentation which will identify the Union's damage claims. Great Northern will then have fifteen (15) days in which to respond.