UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 590, AFL–CIO–CLC, Appellant,

v.

GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

No. 83–5524.

United States Court of Appeals, Third Circuit.

Argued March 9, 1984.

Decided May 16, 1984.

J.M. Maurizi (argued), Balzarini, Carey & Maurizi, Pittsburgh, Pa., for appellant.

Leonard L. Scheinholtz (argued), William Bevan, III, Robert F. Prorok, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee.

Before HUNTER, BECKER, Circuit Judges, and KATZ,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal presents the familiar case of a collective bargaining party displeased with an arbitrator's award. It differs somewhat from the norm in that the arbitrator here was asked not to interpret the parties' agreement, but to determine whether an agreement existed at all. The Great Atlantic & Pacific Tea Company, Inc. ("A & P" or "the company") was a party to a collective bargaining agreement with Local 590 of the United Food and Commercial Workers International Union ("Local 590" or "the union"). When that agreement expired the parties had not yet negotiated a successor agreement. They did agree on a hastily drawn "Memorandum of Agreement" that was intended to form the basis for a more permanent agreement. That more permanent agreement was never executed by both parties.

The arbitrator determined that no collective bargaining agreement existed between the parties. The union brought this action seeking to modify the arbitrator's award. The district court granted summary judgment in favor of A & P, and we will affirm.

I

The Altoona Division of A & P operated nearly a hundred supermarket stores in western Pennsylvania and in portions of adjacent states. The employees in seventy-

* Honorable Marvin Katz, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

seven of these stores were covered by a collective bargaining agreement between A & P and Local 590. This agreement was signed in 1977, and was due to expire on September 27, 1980.

Beginning in June, 1980 A & P and Local 590 tried without success to negotiate a new agreement. A & P's deteriorating position in the region led the company to seek substantial changes in the relationship—changes that the union resisted. The September 27 deadline passed, but the 1977–80 agreement by its terms continued in force during the pendency of the negotiations. On October 23, 1980, the company and union negotiators seemed finally to have reached agreement on the remaining issues. They memorialized their "agreement" in a handwritten Memorandum of Agreement the next day. The parties' apparent intention was to integrate the Memorandum's twenty-four modifications with the 1977–80 agreement at some later date. Until that time, the Memorandum provided, "[a]ll terms and conditions of the present [1977–80] Agreement shall remain in effect except as hereafter modified." App. at 23a.

Some months later, representatives from A & P and Local 590 met to rework the 1977–80 agreement in light of the Memorandum's modifications. These representatives met for two days, marking the changes they jointly believed to be appropriate. The resulting draft was executed by Local 590 on May 27, 1981.

Senior officials at A & P refused to sign the new agreement, however, asserting that it did not accurately reflect the 1980 Memorandum of Agreement in three important respects. First, the draft agreement "rolled in" the Cost of Living Adjustment ("COLA") to the new wage rates. Second, the draft agreement failed to place a 32-hour cap on part-time employees. Third, and most important, the draft failed to delete the "available hours" clause governing assignments to part-time workers.[1]

Between the negotiation of the Memorandum of Agreement in October, 1980 and the company's refusal to execute the proposed 1980–83 agreement, A & P's economic condition had continued to worsen. To reduce costs, A & P shifted several full-time employees to part-time status. The union protested that A & P was obliged by the terms of the available hours clause in the 1977–80 agreement, continued in the draft 1980–83 agreement, to combine part-time positions to create as many full-time positions as possible. A & P countered that Item 6 of the Memorandum of Agreement had specifically provided for the elimination of the available hours clause, and that the inclusion of that clause in the 1980–83 draft agreement was a mistake.

Local 590 filed grievances on behalf of the employees whose status had been reduced, and moved for arbitration. The company objected that there was no collective bargaining agreement currently in force, and therefore nothing for an arbitrator to interpret. On June 18, 1982 the parties selected an arbitrator for the limited purpose of determining whether a valid collective bargaining agreement existed between them during the period when the grievances arose.

The parties consumed four days presenting evidence to the arbitrator. In a thirteen page opinion rendered January 5, 1983, the arbitrator carefully reviewed the

---

**1.** Section 25.11 of the 1977–80 agreement provided:

> Full-time employees shall have seniority over part-time employees in all cases. For all other purposes, store seniority shall prevail. A full time reduced to part time shall have store seniority for hours over all other part time. Part-time employees shall receive all available hours for a full work week in accordance with seniority and ability.

Item 6 of the Memorandum Agreement provided:

*Available Hours*

Eliminate the present clause and substitute the following. Within each store the Employer shall combine part-time assignments on a seniority basis unless such hours duplicate each other, providing the employee can do the work, so as to provide the maximum part-time employment, and further create as many full time positions as possible.

The 1980–83 draft agreement left § 25.11 unchanged, and merely added the operative language of Item 6 as § 3.13.

protracted negotiations leading up to the handwritten Memorandum of Agreement and detailed the present disagreement between Local 590 and A & P. The arbitrator concluded that no collective bargaining agreement had existed between the parties after October 23, 1980.

The arbitrator reasoned that the 1980–83 draft agreement never became effective because A & P refused to sign it and because it varied substantially from the Memorandum of Agreement. The 1980 Memorandum of Agreement, while executed by both parties, could not substitute for the ineffective 1980–83 draft agreement because the parties had never intended it to be a "formal, complete Collective Bargaining Agreement." The arbitrator refused to create a binding contract by rewriting the 1980–83 draft agreement to conform to the Memorandum of Agreement, finding he lacked "any authority to draft a contractual instrument that is binding on the Parties." App. at 19a. In any event, the Memorandum of Agreement was fatally ambiguous on certain vital points, primary among them the available hours clause at issue in the grievance proceedings. Finally, the arbitrator determined that the 1977–80 agreement, despite language continuing its terms during the pendency of negotiations, terminated after the parties executed the Memorandum of Agreement and began to implement its new terms. In the absence of any valid agreement between the parties, the arbitrator concluded, he had no authority to arbitrate the union's grievances.[2]

Local 590 brought an action in federal district court seeking to modify the arbitrator's award and to order A & P to arbitrate the pending grievances. On a motion for summary judgment filed by A & P, the court upheld the arbitrator's award by Memorandum and Order dated June 29, 1983. Local 590 timely appealed the district court's order, which we will affirm.

II

The standard of review applied by federal courts to arbitration awards is exceedingly narrow. "[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." *W.R. Grace & Co. v. Local 759, International Union of the United Rubber Workers*, 461 U.S. 757, ___, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983) (citing *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960)). This court has described the limited nature of federal courts' power to review in even stronger terms. A federal court should uphold an arbitrator's interpretation, we have said,

if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.

*Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969).

Given the very narrow scope of judicial review in cases of this nature, we must affirm the district court in refusing to modify the arbitrator's award. Having select-

---

**2.** The arbitrator succinctly summarized his findings as follows:

There was never a valid Collective Bargaining Agreement in effect between the Company and the Union for Company employees of the Altoona Division, for the period from September 28, 1980 to October 1, 1983. The 1977–80 Agreement temporarily was extended during negotiations, but terminated on October 23, 1980. Any grievances that are predicated either, upon the draft of the proposed 1980–83 Labor Agreement or on the 1977–80 Labor Agreement, concerning events that occurred after October 23, 1980, are not arbitrable because no valid Labor Agreement exists under which the propriety of the Company's actions can be measured.

App. at 22a.

ed their arbitrator, Local 590 and A & P expressly agreed to let him decide whether an agreement existed or not. The arbitrator applied standard principles of contract law and determined that the gap between the parties' positions on vital issues was sufficiently large to negate the existence of an enforceable collective bargaining agreement. Under these circumstances, reversal would impermissibly gainsay the parties' chosen arbiter.

Accordingly, we will affirm the order of the district court refusing to modify the arbitrator's award.

BECKER, Circuit Judge, dissenting:

I agree that our scope of review of a labor arbitrator's decision is extremely narrow. But that does not mean that there are no circumstances under which an arbitrator's decision may be set aside. If an examination of the record before the arbitrator reveals no support whatever for his determination, his award must be vacated. *NF & M Corp. v. United Steelworkers of America,* 524 F.2d 756 (3d Cir.1975); *Swift Industries, Inc. v. Botany Industries, Inc.,* 466 F.2d 1125, 1131 (3d Cir.1972) (an arbitrator's award "may not stand if it does not meet the test of fundamental rationality"); *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123 (3d Cir.1969). I believe that this is a case where no reasonable person could conclude that there is no contract between the parties, and that therefore the arbitrator's award does not meet the test of fundamental rationality.

In his decision, the arbitrator made three findings in response to the union's three alternative theories that a contract existed: (1) there was no 1980–83 collective bargaining agreement ("CBA"), because there was never a meeting of the minds between the

parties,[1] and because the employer refused to sign the union's draft 1980–83 CBA; (2) although the October 24, 1980 Memorandum of Agreement ("MOA"), was signed by both parties and expressly incorporated the terms of the 1977–80 CBA, it was not a contract because the parties did not "intend" it "to be a final, complete contract document"; and (3) although by its express terms the 1977–80 CBA remained in force pending agreement on a new CBA, the employees rejected it on September 23, 1980, when they voted to accept the "agreement in principle" between the union and the employer (which agreement became the MOA the next day), and therefore the 1977–80 CBA was not in force after September 23, 1980. If we hold that any one of these findings is completely unsupported by the record, we must reverse. I believe that the second and third findings are indefensible on the record of this case.

First, as to the MOA, I see absolutely no reason why this document is not a binding and enforceable contract. The MOA is handwritten by one of the employer's representatives to the negotiations, and it is signed on behalf of the employer by Harry Boyle, the company's "Area Director of Labor Relations." (Jack Draper, President of Local 590, signed on behalf of the union.) The MOA contains 25 provisions dealing with everything from wages to job security. In addition, the MOA expressly incorporates the 1977–80 CBA except as it has been modified by the written provisions of the MOA. *See* Preface to MOA and paragraph 25, Appendix at 23a & 31a. Since it is a well-settled principle of labor law that where the actions of the parties indicate that an agreement has been reached, then the courts will find that a contract exists,[2] I cannot comprehend how the MOA can be deemed not to be a contract. Yet, that is exactly what the arbitrator in this case held:

---

**1.** According to the arbitrator there was no agreement on at least three essential provisions: (1) retention of the available-hours clause; (2) absence of a 32-hour cap on part-time employees; and (3) the COLA roll-in. Appendix at 16a.

**2.** *See Capitol-Husting Co., Inc. v. NLRB,* 671 F.2d 237, 242 (7th Cir.1982) ("In the context of labor disputes ... the technical question of whether the contract was accepted in the traditional sense is perhaps less vital than it otherwise

The MOA was not intended to be a final, complete contract document and both Parties anticipated that their "bargain" would have to be moulded into a more formal and complete instrument that would be approved and executed by the properly authorized officials representing the Parties.

Appendix at 19a. This theory that the MOA was not a binding contract is totally unexplained and unsupported.[3]

The parties in this case are sophisticated entities with experienced lawyers. No one signs a memorandum of agreement containing 25 contract provisions and incorporating a prior CBA between the parties without believing he has signed a binding contract. It is undoubtedly true, as the arbitrator says, that the parties expected to "mold" their agreement into a more "formal" (read "typed") agreement in the future. And it would be naive to think that disputes concerning the meaning of various provisions of the MOA would not arise during the contract period.[4] But that does not mean that the MOA was not a binding contract. It is a fact of life that parties to a labor contract will seek concessions from each other both during the negotiation stage and during the period of the contract. Indeed, the employer and union often agree to place provisions in the CBA that are deliberately ambiguous, choosing to fight for their position during an arbitration proceeding rather than risk the economic consequences of a strike. My point is simply this: what more could the union and the employer have done to make the MOA a binding contract? My answer is that they did everything the law requires to make the MOA a binding contract, and therefore, being sophisticated parties, they obviously intended to have a binding contract. The arbitrator's conclusionary sentence to the contrary is capricious. Therefore, I would reverse.

In my view, the arbitrator was also capricious in his finding that, assuming that there was no 1980–83 CBA and that the MOA was non-binding, the 1977–80 CBA was not in force after September 23, 1980. The 1977–80 CBA contained the following provision:

*SECTION 33 DURATION OF AGREEMENT*

33.1 This Agreement shall be effective commencing 12.01 a.m., October 2, 1977

---

would be. Rather, a more crucial inquiry is whether the two sides have reached an 'agreement', even though that 'agreement' might fall short of the technical requirements of an accepted contract.") *quoting NLRB v. Donkin's Inn, Inc.,* 532 F.2d 138, 141 (9th Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976); *NLRB v. Haberman Construction Co.,* 641 F.2d 351, 355–56 (5th Cir.1981) (en banc) ("It is well settled that a union and employer's adoption of a labor contract is not dependent on the reduction to writing of their intention to be bound .... Instead what is required is *conduct manifesting an intention* to abide by the terms of an agreement.") (footnote omitted; emphasis added); *Wilkes Barre Printing Pressmen & Assistants' Union, No. 137 I.P.P. & A.E. v. Great Northern Press,* 522 F.Supp. 106, 111 (M.D.Pa. 1981) ("[L]abor agreements are governed by the 'objective theory' of contracts. In other words, the central inquiry for the court is whether the actual conduct of [employer and union] would have manifested offer and acceptance to a reasonable observer, regardless of the subjective intent of the negotiators.")

**3.** The majority does not dispute the fact that the arbitrator offered no explanation for his conclusion. *But see Virgin Islands Nursing Assoc.'s Bargaining Unit v. Schneider,* 668 F.2d 221, 223–24 (3d Cir.1981) (declining to impose a requirement that arbitrators state reasons for their decisions). However, the majority does state that "[i]n any event, the Memorandum of Agreement was fatally ambiguous on certain vital points, primary among them the available hours clause at issue in the grievance proceedings." The arbitrator never so stated, and there is no support in the record for the majority's conclusion on this point.

**4.** Indeed, as the majority essentially concedes, the real reason that A & P refused to sign the 1980–83 CBA was that "[b]etween the negotiation of the Memorandum of Agreement in October, 1980, and the company's refusal to execute the proposed 1980–83 agreement, A & P's economic condition had continued to worsen."

and shall remain in force until and including September 27, 1980 and from year to year thereafter, with the right of either party to reopen upon written notice not less than sixty (60) days prior to September 27, 1980 or the 27th day of September of any subsequent year thereafter, of a desire either to change or terminate this Agreement. In the event either party serves notice, it is agreed that the Employer and the Union without undue delay, shall begin negotiations on the proposed modifications and that, pending the results of such renegotiations, neither party shall change the conditions existing at the time under the Agreement.

The obvious intent of this provision was that the 1977–80 CBA would continue in effect until a new contract was agreed to, or until negotiations broke off. The arbitrator apparently agreed; he concluded, however, that, when the employees voted to accept the terms of the MOA and the employer implemented those terms, those actions were in fact a rejection of the 1977–80 CBA.[5] With all respect to the arbitrator, this makes no sense. The arbitrator's decision placed the employees in a situation that only Lewis Carroll could appreciate: because they accepted the MOA the 1977–80 CBA was terminated, but because the MOA was not binding on A & P, there was no contract. I believe the only logical interpretation of the employees' decision to approve the terms of the MOA is that they

did so *conditionally* on the MOA being a binding contract. Ineluctably, if the MOA was not a binding contract (as the arbitrator held) the 1977–80 CBA by its own terms remained in effect.[6]

For the foregoing reasons, I respectfully dissent.

---

5. The arbitrator stated:
   In the Union's Post-Hearing Brief, it argues in the alternative, that if there is no valid 1980–83 Agreement, the 1977–80 Agreement has remained in full force and effect. We have carefully studied the language in Section 33 of the 1977–80 Agreement and evaluated the actions of the Parties, during and after their negotiating sessions. Numerous changes in the 1977–80 Contract were finally agreed upon including increased wage rates. The Union's version of the "agreement in principle" was submitted to the membership and approval was voted of this package. However ambiguous these activities appear in retrospect, they indicate that both Parties considered the 1977–80 Contract ended.

6. The arbitrator also appears to have been troubled by the prospect of applying the 1977–80 CBA to the employer-employee relationship in 1981 because the employer had made a substantial number of changes, including increasing wages, on the basis of the MOA. I do not doubt that application of the 1977–80 CBA to the post-MOA work relationship between the employer and employees would be difficult, but that does not mean that the 1977–80 CBA is invalid. It is the arbitrator's duty to make difficult decisions, and this one is no different from any other.