

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-22-1994

# Connors, et al. v. Fawn Mining Corp.

Precedential or Non-Precedential:

Docket 93-3304

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Connors, et al. v. Fawn Mining Corp." (1994). *1994 Decisions.* Paper 92.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/92

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 93-3301


JOSEPH P. CONNORS, SR.; DONALD E. PIERCE; WILLIAM MILLER;
THOMAS H. SAGGAU; PAUL R. DEAN, as Trustee of the United Mine
Workers of America 1950 Pension Trust 1950 Benefit Plan and Trust
1974 Pension Trust, and 1974 Benefit Plan and Trust
v.

FAWN MINING CORPORATION,
a corporation,

v.

DISTRICT 5, UNITED MINE WORKERS OF AMERICA, AFL-CIO;
INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, AFL-CIO,

Third Party Defendants

FAWN MINING CORPORATION,

Appellant


On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 92-00305)


Argued January 10, 1994

BEFORE: STAPLETON, COWEN and ALITO, <u>Circuit Judges</u>

(Opinion Filed July 25, 1994)



Michael J. Healey (Argued)
Healey, Davidson & Hornack
Fifth Floor
Law & Finance Building
Pittsburgh, PA 15219



1

                    Attorneys for Appellees
                    International Union, UMWA and
                    District 5, UMWA
          Ralph A. Finizio
          Houston Harbaugh
          Two Chatham Center
          12th Floor
          Pittsburgh, PA 15219

                    and

          David W. Allen, General Counsel
          Margaret M. Topps, Deputy
          General Counsel
          Larry D. Newsome (Argued)
          Assistant General Counsel
          Kenneth M. Johnson
          UMWA Health and Retirement Funds
          Office of the General Counsel
          4455 Connecticut Avenue, N.W.
          Washington, DC  20008

                    Attorneys for Appellees
                    Joseph P. Connors, et al.

          Allan L. Fluke (Argued)
          Thomas E. Weiers, Jr.
          Rich, Fluke, Tishman & Rich
          220 Two Chatham Center
          Pittsburgh, PA  15219

                    Attorneys for Appellant
                    Fawn Mining Corporation

OPINION OF THE COURT


STAPLETON, Circuit Judge:

The trustees of the United Mine Workers of America 1950 Pension Benefit Plan and Trust ("the 1950 Plan"), and the United

Mine Workers of America 1974 Pension Benefit Plan and Trust ("the 1974 Plan") (collectively, "the Plans"),[0] claim that Fawn Mining Corporation ("Fawn Mining") failed to fulfill its obligations under the 1988 National Bituminous Coal Wage Agreement ("Wage Agreement")[0] when it failed to contribute to the 1950 Plan for its employees for the period of May 24, 1990, through April 30, 1991.[0]  The trustees initiated this action pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and section 502(e) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e), to collect these allegedly delinquent contributions.  Fawn Mining responded by filing a third-party complaint against District 5, United Mine Workers of America, AFL-CIO ("District 5"), and the United Mine Workers of America International, AFL-CIO ("International") (collectively, "the UMW"), alleging that it was not contractually obligated to

---

[0]The Plans were established through collective bargaining between the United Mine Workers of America and the employers in the bituminous coal industry and have been maintained under successive National Bituminous Coal Wage Agreements.

[0]Article XX(d) of the Wage Agreement provides that:

> During the life of this Agreement . . . each signatory Employer engaged in the production of coal shall contribute to the Trusts . . . the amounts specified below based on cents per ton on each ton . . . of bituminous coal produced by such Employer for use or for sale, and, in addition, each signatory Employer . . . shall contribute to the Trusts . . . the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

[0]The plaintiff calculates this sum as $344,785.90, to which it also seeks to add "double interest" and costs and attorney's fees pursuant to 29 U.S.C. § 1132(g)(2).

3

contribute to the 1950 Plan because the UMW had agreed to exempt Fawn Mining from the portion of the Wage Agreement that required contribution to this plan. Fawn Mining further claimed that if it were responsible for contributions to the 1950 Plan, it would be entitled to indemnification from the UMW.

Following discovery, all parties filed motions for summary judgment. A magistrate considered these motions and prepared a report and recommendation. The magistrate found that even assuming that the UMW agreed to waive Fawn Mining's contractual obligations regarding the 1950 Plan, this agreement would not be binding on the trustees of the benefit plan. With regard to the union's liability to Fawn Mining, the magistrate concluded that there was no basis for requiring the UMW to indemnify Fawn Mining. Thus, the magistrate judge recommended that the court grant both the Plans' and the UMW's motions for summary judgment, and deny Fawn Mining's motion for summary judgment. The district court adopted the magistrate judge's report and recommendation as the opinion of the court. Fawn Mining now appeals.

I.

BethEnergy Mines, Inc. and Bethlehem Steel Corporation (collectively, "BethEnergy") intended to terminate operations at their Saxonburg, Pennsylvania coal mine facility and permanently lay-off all employees who worked at this site. Those employees were represented by District 5. When District 5 learned of the planned closing, it began to actively solicit prospective buyers

4

of the mine so that operations could continue and the jobs of its members could be saved.  Donald Redman ("Redman"), president of District 5, contacted principals of the CLI Corporation ("CLI") in January, 1990, to ask if CLI was interested in purchasing the mine.  CLI expressed interest in arranging for Fawn Mining, one of its subsidiaries, to purchase the mining assets from BethEnergy.

After some investigation, however, Fawn Mining representatives concluded that it would not be profitable for it to purchase the mine if it would be bound by the terms of the Wage Agreement, which BethEnergy and District 5 had previously signed.  This created a problem, however, because Article I of the Wage Agreement stated that:

> [E]ach employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement.

Fawn Mining thus knew that BethEnergy would not sell it the mining operation unless it either agreed to assume the terms of the Wage Agreement or gained concessions from the UMW regarding the requirements of that agreement.[0]  As a result, Fawn Mining representatives had numerous discussions with Redman regarding the Wage Agreement.  These discussions focused on the possibility of exempting Fawn Mining from the provision of the

---

[0]Because other subsidiaries of CLI had signed the 1988 Wage Agreement, CLI was well aware of the language of Article I prohibiting employers from selling their assets to successors that did not agree to abide by the agreement.

5

Wage Agreement that required employer contributions to the 1950 Plan. Redman, who stated at his deposition that his biggest concern was keeping the mine open and his members employed, admitted to having lengthy discussions with Fawn Mining regarding the possibility of granting Fawn Mining an exemption from participating in the 1950 Plan.

Redman told representatives of Fawn Mining that other companies that had purchased struggling mining operations were granted exemptions by the UMW from some of the terms of the 1988 Wage Agreement, including the term requiring contribution to the 1950 Plan. Redman stated, either explicitly or implicitly, that he favored granting Fawn Mining an exemption from the requirement that it contribute to the 1950 Plan at some time down the road if it would keep the mine open and UMW members employed. Fawn Mining representatives knew, however, that Redman alone did not have the authority to grant such an exemption.

The parties disagree about what exactly happened next. According to Fawn Mining representatives, Redman told them that he had spoken to the International President, and that the president had given him the authority to grant Fawn Mining an exemption from the 1950 Plan. Fawn Mining representatives further testified that Redman promised them that if Fawn Mining purchased BethEnergy's assets, it would be immediately exempt from contributing to the 1950 Plan. In other words, the collective bargaining agreement between Fawn Mining and the UMW would be identical to the Wage Agreement, except that it would not include a provision requiring contribution to the 1950 Plan.

6

Redman, however, remembered the negotiations somewhat differently. According to him, he made it clear to Fawn Mining representatives that he had no authority to grant an exemption from the 1950 Plan. Furthermore, he claimed that he promised only that he would seek the exemption from International President Trumpka after Fawn Mining had operated the mine for one year. Redman stated that he told Fawn Mining representatives he wanted to wait a year before granting the exemption because if operations continued for at least that much time, it would be clear that Fawn Mining was serious about turning the mining operations into a profitable business, and that it was possible to do so. At that point, if it would help save the mine for the long term, Redman would seek the exemption.

While these negotiations between Fawn Mining and the UMW were taking place, BethEnergy issued a "WARN" notice announcing that it would close the mine on May 25, 1990 unless a purchaser who had a collective bargaining agreement with the UMW was found by that time. Representatives of the UMW knew that once the mine was shut down, it would be even more difficult to find a purchaser and re-start operations. So, on May 24, 1990, the day before the purchase deadline imposed by BethEnergy, Fawn Mining Vice President Robert Irey ("Irey") and CLI Chief Financial Officer William Stein ("Stein") met with Redman at the District 5 office to reaffirm understandings reached in the prior negotiations covering the mining operation.

At the end of this meeting, Redman and Irey both signed a single sheet of paper confirming their agreement. This paper

7

was a copy of the last page of the 1988 Wage Agreement, which is the page that employers and local unions sign to indicate that they are consenting to becoming parties to that agreement. At the time Redman and Irey signed this page, however, it was not attached to any other document. According to Irey and Stein, when Irey signed this page, they and Redman had an understanding that they were signing a commitment to be obligated by the terms and conditions of the 1988 Wage Agreement, but with the promised exemption from the 1950 Plan. Furthermore, Irey and Stein claimed that all parties agreed that the signature page would be sent to International President Trumpka for his signature. Then, the signature page would be attached to a document identical to the Wage Agreement except for the 1950 Plan exemption, and a copy would be sent to Fawn Mining. Redman, however, denied that any such agreement existed when he and Irey signed the signature page. He stated that at the time of signing, he believed that Fawn Mining was signing onto the entire Wage Agreement, including the provision requiring contribution to the 1950 Plan, and that the only understanding between the parties was that Redman would seek the exemption in one year if it would increase the longevity of the mine.

One day later, on May 25, 1990, Fawn Mining signed an Asset Purchase Agreement for the acquisition of the mine from BethEnergy. Article 3.1.5 of this Asset Purchase Agreement stated that Fawn Mining would assume all of BethEnergy's obligations and liabilities under the Wage Agreement, and it acknowledged that it had copies of this agreement. The Asset

8

Purchase Agreement did not mention any exemption from the 1950 Plan. BethEnergy sent a letter to the UMW on June 4, 1990 announcing the sale of the mine to Fawn Mining, and stating that Fawn Mining had agreed to accept BethEnergy's obligations under the Wage Agreement. This letter also did not mention a waiver of any of the agreement's provisions.

Once Fawn Mining took over operations it began to make remittances to the 1974 Plan, as required by the Wage Agreement. It did not, however, make any contributions to the 1950 Plan. In August of 1990, the Plans informed Fawn Mining that they still had not received a signed copy of the agreement reached between it and District 5, and requested that they be sent one. Fawn Mining responded to the Plans' request by sending them a file it kept of information regarding the contract and a copy of the signature page signed by representatives from District 5 and Fawn Mining.

In October 1990, Fawn Mining began to receive notices from the 1950 Plan that contributions were owed.[0] However, Fawn Mining did not respond to any of the Plans' notices. In fact, it did not inform the Plans that it believed it was exempt from contributing to the 1950 Plan until April 1992, when it sent the Plans a memorandum. According to Fawn Mining representatives Irey and David Chedgy (CLI's President), the reason for this delay was that during this time they were attempting to obtain from Redman a copy of the agreement showing that the 1950 Plan

---

[0] Fawn Mining received from the Plans two delinquency notices in October 1990, one in December 1990, and one in January 1992.

9

provision had been excluded, but that Redman was brushing them off, stating simply that, "its coming."

On December 28, 1990, CLI sent Redman a letter regarding the written exemption, which stated, in part:

> With regard to the economics of the operation, you will recall that before the deal was cut with Bethlehem, the question of payments to the UMWA Health and Retirement Funds was discussed with you and we were assured, verbally, that we would not have to make any contribution to the "50's" Fund. We recently received a demand from the UMWA Health and Retirement Fund Administrators for payment of overdue contributions to this fund of $163,734 for the period June 1, 1990 to October 31, 1990. . . .
>
> . . . We believe it is fair to say that, if we had not been given your assurance that we would not have to pay into this fund, we would not have proceeded with the deal.
>
> With the [bleak economic] situation we are now facing, it is even more important to obtain clarification of the position. We feel that it is absolutely essential that a written amendment to the original agreement, similarly dated, specifically exempting Fawn from payments into the "50's" Fund, be drawn up and signed by authorized UMWA officials.

App. 781-82.

Due to excessive losses, Fawn Mining ceased operations at the mine in February, 1991, just ten months after it purchased the mining assets from BethEnergy. On February 14, 1992, the Plans initiated this action seeking delinquent contributions and other statutory remedies.

In his Report and Recommendation, the magistrate judge pointed to case law holding that written contractual obligations in collective bargaining agreements control over alleged oral

10

modifications. See Central States S.E. & S.W. Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148 (7th Cir. 1989) (en banc); Trustees of Laborers Local Union #800 Health and Welfare Trust Fund v. Pump House, Inc., 821 F.2d 566 (11th Cir. 1987); Southwest Adm'rs, Inc. v. Rozay's Transfer, 791 F.2d 769 (9th Cir. 1986), cert. denied, 479 U.S. 1065 (1987). Further, as evidence of Fawn Mining's agreement to assume all of the obligations in the Wage Agreement, the magistrate judge pointed to its Asset Purchase Agreement with BethEnergy and to the fact that Fawn Mining was aware of the Wage Agreement's requirement that signatory employers such as BethEnergy could transfer the mine only to parties who agreed to abide by the same collective bargaining agreement.

The magistrate went on to say that even if there was a local undisclosed side agreement between the UMW and Fawn Mining to waive the 1950 Plan obligations, this type of agreement would be irrelevant and not binding on the Plans, because they were not a party to the side agreement. The magistrate judge, citing Lewis v. Benedict Coal, 361 U.S. 459 (1960), stated that the only potential impact of this side agreement would be on the liability of the UMW to Fawn Mining. However, since he found no legal basis for Fawn Mining's indemnity claim, the magistrate judge recommended that the UMW's motion for summary judgment be granted.

II.

11

We exercise plenary review over the district court's decision to grant appellees' motions for summary judgment.[0] _Public Interest Research of N.J. v. Powell Duffryn Terminals, Inc._, 913 F.2d 64, 76 (3d Cir. 1990) ("In reviewing a grant of summary judgment, we apply the same test as the district court should have used initially.") (citing _Erie Telecommunications, Inc. v. City of Erie_, 853 F.2d 1084, 1093 (3d Cir. 1988)), _cert. denied_, 111 S. Ct. 1018 (1991).

Under the Federal Rules of Civil Procedure, a court may grant a motion for summary judgment only if there is no genuine issue of material fact and the moving party is subject to judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." _Id_. Any dispute over a fact which is irrelevant or unnecessary will not preclude a grant of summary judgment. _Id_.

The moving party has the initial burden of informing the court of the basis for a motion of summary judgment and pointing out those parts of the record which he or she believes demonstrate the absence of a genuine issue of material fact. _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986). If the

---

[0]The district court had jurisdiction over this action pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(c), and also under § 502(e) of ERISA, 29 U.S.C. § 1132(e). We have jurisdiction to review this final judgment of the district court pursuant to 28 U.S.C. § 1291.

12

moving party can satisfy his or her initial burden, the nonmoving party "'may not rest upon the mere allegations or denials of his [or her] pleadings, but his [or her] response . . . must set forth specific facts showing that there is a genuine issue for trial.'" Gans v. Mundy, 762 F.2d 338, 341 (3d Cir.) (quoting Fed. R. Civ. P. 56(e)), cert. denied, 474 U.S. 1010 (1985). However, all reasonable inferences that can be drawn from the record must be viewed in the light most favorable to the party opposing the motion. Sorba v. Pennsylvania Drilling Co., Inc., 821 F.2d 200, 202-03 (3d Cir. 1987), cert. denied, 484 U.S. 1019 (1988).

## III.

Fawn Mining's defense to the Plans' motion for summary judgment was that it had been affirmatively led by the UMW to believe that the agreement it was signing did not require it to contribute to the 1950 Plan at any time. In other words, Fawn Mining claimed that the UMW had fraudulently obtained the agreement under which the contributions sought were allegedly due. The district court rejected this defense, however, because it felt that the Plans were not bound by any undisclosed "side agreements" that may have existed between Fawn Mining and the UMW. Apparently, the court believed that Fawn Mining's defense to the Plans' summary judgment motion lacked merit regardless of whether the UMW committed fraud. For the reasons that we set forth below, however, we believe that the answers to the

13

questions of whether the UMW committed fraud, and, if so, what type of fraud, are highly relevant here.

The Plans are third-party beneficiaries of the Wage Agreement. Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992) (citing Southwest Adm'rs, Inc. v. Rozay's Transfer, 791 F.2d 769, 773 (9th Cir. 1986), cert. denied, 479 U.S. 1065 (1987)). "The rights of third-party beneficiaries typically are subject to any defenses that the promisor could assert in a suit by the promisee." Id. (citing John D. Calamari & Joseph M. Perillo, The Law of Contracts § 17-10 (3d ed. 1987)). However, third-party beneficiaries are subject to a more limited number of defenses when the contract at issue is a collective bargaining agreement. Agathos, 977 F.2d at 1505. For example, the Supreme Court has held that "the parties to a collective bargaining agreement must express their meaning in unequivocal words before they can be said to have agreed that the union's breaches of its promises should give rise to a defense against the duty assumed by an employer to contribute to a welfare fund." Lewis v. Benedict Coal Corp., 361 U.S. 459, 470-71 (1960), cited in Agathos, 977 F.2d at 1505.

Moreover, section 515 of ERISA, 29 U.S.C. § 1145, speaks to the recoverability of contributions from an employer in the position of Fawn Mining. Section 515 states:

> Every employer who is obligated to make
> contributions to a multi-employer plan under
> the terms of the plan or under the terms of a
> collectively bargained agreement shall, to
> the extent not inconsistent with law, make
> such contributions in accordance with the

14

terms and conditions of such plan or agreement.

The courts have interpreted section 515 as severely limiting the defenses available to an employer who has signed an agreement which commits it to make contributions to a benefit fund. <u>Agathos v. Starlite Motel</u>, 977 F.2d 1500 (3d Cir. 1992).[0] Our review of the case law in the <u>Agathos</u> case, for example, revealed that "an employer may not assert defects in the formation of the collective bargaining agreement, such as . . . fraud in the inducement or oral promises to disregard the text of the agreement." <u>Id.</u> at 1505 (citations omitted). Indeed, we concluded that the cases recognized only three defenses. One of those defenses, however, is possibly relevant here. Claims for contributions delinquent under the terms of a collective bargaining agreement can be defeated if it is shown that "the collective bargaining agreement is void <u>ab initio</u>, as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement." <u>Id.</u>

Accordingly, the crucial issue in this case is whether the defense that Fawn Mining has asserted is one of fraud in the inducement or fraud in the execution. If we decide that the claim is one of fraud in the inducement, we must affirm the decision of the district court to grant the Plans' motion for summary judgment, as this is an invalid defense for an employer

---

[0] <u>See</u> <u>also</u>, <u>Rozay's Transfer</u>, 791 F.2d at 773 ("In recognition of the fact that millions of workers depend upon employee benefit trust funds for their retirement security, Congress and the courts have acted to simplify trust fund collection actions by restricting the availability of contract defenses, which make collection actions unnecessarily cumbersome and costly.").

15

to use in response to a benefit plan's claim for delinquent contributions. However, if we find that Fawn Mining has asserted a claim of fraud in the execution, and, furthermore, that there exists a genuine issue of material fact as to whether the UMW committed such fraud, we must reverse the summary judgment in favor of the Plans.

As stated by the Court of Appeals for the Ninth Circuit, the distinction between fraud in the inducement and fraud in the execution is that, "[t]he former induces a party to assent to something he otherwise would not have; the latter induces a party to believe the nature of his act is something entirely different than it actually is." Rozay's Transfer, 791 F.2d at 774 (citing 12 Walter H.E. Jaeger, Williston on Contracts § 1488, at 332 (3d ed. 1970)). The court went on to explain that, "'[f]raud in the execution' arises when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms.' . . . Fraud in the execution results in the agreement being void ab initio, whereas fraud in the inducement makes the transaction merely voidable." Id. (quoting U.C.C. § 3-305(2)(c)) (other citations omitted).

On several prior occasions, courts have been required to apply this distinction in order to determine whether an employer's asserted defense to a benefit fund's claim for delinquent contributions was valid. In Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992), for example, the employer argued before us that he was not responsible for

16

payments to a benefit fund as the fund had claimed, because even though the collective bargaining agreement specified that all employees would be included in the benefit fund, the employer and the union had orally agreed that only two of the employees would be covered. This court held that this defense was one of fraud in the inducement rather than fraud in the execution, and, therefore, that it was an invalid defense under the circumstances. According to the court, "[t]o prevail on a defense of fraud in the execution, a party must show 'excusable ignorance of the contents of the writing signed.'" Id. at 1505-06 (citing Rozay's Transfer, 791 F.2d at 774 (quoting U.C.C. § 3-305 cmt. 7); Calamari & Perillo, supra, § 9-22 (party claiming fraud in the execution must show that he "signed an instrument that is radically different from that which [he] is led to believe that he is signing")). The court concluded that in the case before it, the employer made no such showing because it did "not argue that it thought the collective bargaining agreement it signed was a different document[,] [n]or did [it] contend that the Union misrepresented the nature of the document it was asked to sign." Id. at 1506.

In Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148 (7th Cir. 1989) (en banc), the Court of Appeals for the Seventh Circuit was faced with a virtually identical situation and reached the same conclusion. According to the benefit fund, the employer had made contributions for only three of his employees rather than all of them. The employer's defense was that

17

although the collective bargaining agreement stated that all employees would be included in the benefit fund, it and the union had orally agreed that only three specific employees would participate in the fund. The court held that the employer was liable for benefit fund contributions for all of his employees, as stated in the contract. In so holding, the court rejected the employer's defense because it found it to be one of fraud in the inducement, which is an invalid defense to a claim for contributions by a benefit fund. Id. at 1153 ("If the employer simply points to a defect in its formation--such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law--it must still keep its promise to the pension plans.").

As yet another example, in Rozay's Transfer, a benefit fund had filed a claim against the employer for delinquent contributions that had accrued after the previous collective bargaining agreement had expired but before a new agreement had been reached. The employer's defense was that the union had promised it that the benefit fund would waive these contribution requirements, and that it had signed the collective bargaining agreement under the belief that this waiver had been approved. The benefit fund had rejected the union's request for such a waiver, however, and the union had failed to convey this rejection to the employer. The court held that the employer's defense was one of fraud in the inducement, and not one of fraud in the execution. Specifically, the court stated that:

18

> Rozay's Transfer cannot persuasively contend that fraud in the execution is presented on the facts of this case. Rozay acknowledged at trial that he was fully aware that the document he signed was a collective bargaining agreement and that the agreement was effective as of [the day that the original agreement expired], thus obligating the payment of contributions to the trust fund for the disputed period.
>
> To maintain a defense of fraud in the execution, Rozay's Transfer would have to establish "excusable ignorance of the terms of the contents of the writing signed." See Uniform Commercial Code § 3-305 comment 7. But there simply was no confusion as to the actual contents of the agreement. Instead the misrepresentation concerned whether the express provisions of the agreement would in fact be enforced--an example of fraud in the inducement, as the district court found.

791 F.2d at 774-75. The Rozay's Transfer court rejected the employer's defense, citing Southern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262, 1266 (9th Cir. 1984), for the proposition that "a claim that a promise to make contributions was fraudulently induced is not a legitimate defense to a trust fund's action to recover delinquent contributions." Rozay's Transfer, 791 F.2d at 775.

The court in Rozay's Transfer distinguished its facts from those of a prior Ninth Circuit case, Operating Engineers Pension Trust v. Gilliam, 737 F.2d 1501, 1503 (9th Cir. 1984). In Gilliam, an employer claimed that he had signed a document which the union had told him was an application to become a union member as an owner-operator. In actuality, however, the document was a collective bargaining agreement covering all of his

19

employees, which required him to make contributions to a trust fund on their behalf. The trust fund later filed a claim against the employer for delinquent contributions due under the agreement. The court held that the employer "was not obligated to make such payments as he had reasonably relied on the union's representation that he was signing a document of a wholly different nature." 791 F.2d at 774 (citing Gilliam, 737 F.2d at 1504-05). The Rozay's Transfer court said that the key distinction between its facts and the facts of Gilliam was that the employer in Gilliam had asserted the valid defense of fraud in the execution, while the employer in Rozay's Transfer had asserted the invalid defense of fraud in the inducement.

With these cases in mind, we turn to the facts at hand. As pointed out by Fawn Mining, on the day that the signature page was signed embodying the existence of an agreement between the parties, there was significant time pressure on both sides due to the fact that the mine was set to close the next day. The only document that the parties physically had before them was a signature page of a standard Wage Agreement. Although no document was attached to this page at the time, Fawn Mining claims that both sides intended the signing of this page to symbolize their agreement to all terms of the Wage Agreement other than the 1950 Plan provision and that both contemplated that this page, when formally executed by an appropriate official of the International, would be appended to a copy of the Wage Agreement with the 1950 Plan provision deleted. According to Stein:

20

> [There was a] need to sign the agreement because of the impending closing on the asset purchase agreement the next day. Mr. Irey was very hesitant to sign that agreement because it did not -- we had no written . . . documentation of our waiver from the '50's funds. Mr. Redman assured him that that had been approved by Mr. Trumpka and it would be forthcoming with the signed agreement by Mr. Trumpka.

App. 609-10.

Unlike the employers in the fraudulent inducement cases, Fawn Mining does not claim there was an oral modification of a written collective bargaining agreement it had signed. According to Fawn Mining, it did not knowingly enter into an agreement to contribute to the 1950's Fund with the expectancy that the agreement would not be enforced or the obligation later waived. Rather, Fawn Mining and Redman signed the unattached signature page the day before Fawn Mining's closing with BethEnergy to permit the transfer of the mine assets and to avoid mine closure. The parties' agreement and understanding at the time the page was signed was that there was no contractual obligation on the part of Fawn Mining to contribute to the 1950 Benefit Fund.

We hold that Fawn Mining is asserting a defense of fraud in the execution, which, if proven, would be a valid defense to the Plans' claim. Fawn Mining's defense is equivalent to a claim of "excusable ignorance of the contents of the writing signed." Furthermore, because both Fawn Mining and the UMW admit that the 1950 Plan provision was an important issue to both parties, if Fawn Mining was in fact led to believe that it was signing an agreement that did not include this provision, an

21

agreement that did contain this provision would be "radically different" from one which did not require contribution to the plan. Therefore, Fawn Mining's defense falls within the definition of fraud in the execution that this court laid out in Agathos. Additionally, we believe that the facts of this case more closely resemble those of Gilliam than they do those of Gerber or Rozay's Transfer because here Fawn Mining is claiming that it was misled as to what the actual language of the contract would be. It is not asserting that it signed a contract, the terms of which were as it intended them to be, but did so only because it was misled about the existence of a side agreement.

If an employer reviews a document reflecting the agreements reached in collective bargaining and the union surreptitiously substitutes a materially different contract document before both sides execute it, we think it clear that there has been a fraud in the execution of the contract and that the agreement reflected in the executed document is void ab initio and unenforceable by the union. The employer has never manifested an assent to the terms of the alleged contract, and the written document purporting to evidence the agreement has been obtained by fraud.

We believe the situation before us is not materially different. Under the facts here alleged by Fawn Mining, the Plans are suing on what purports to be a written contract. The employer has never manifested assent to the terms contained in that contract, however, and the document itself has been procured by fraud. In our view, the fact that the union allegedly

22

substituted the body of the contract document after the execution of the signature page, rather than before, does not convert this suit from a fraud in the execution case into a fraud in the inducement one.

Because Fawn Mining is asserting a fraud in the execution defense and because the conflicting deposition testimony raises genuine issues of material fact regarding this defense (i.e. whether the UMW actually did lead Fawn Mining to believe that the 1950 Plan provision would not be included in the language of the agreement), we will reverse the summary judgment in favor of the Plans.[0]

The UMW argues that even if we find that Fawn Mining's defense is valid in theory because the parties intended this agreement to exclude the 1950 Plan provision, we must still reject it because any evidence of such an intent would be

---

[0] It is true, as the district court stressed, that the Asset Purchase Agreement specifically committed Fawn Mining to assume all obligations of the Wage Agreement, and that Fawn Mining failed promptly to notify the Plans that the collective bargaining agreement it had signed with the UMW did not include the 1950 Plan provision. While these two facts provide a basis for an inference adverse to Fawn Mining, they would not preclude a trier of fact from accepting the version of the facts reflected in the depositions of Irey and Stein. Even though Fawn Mining obligated itself to BethEnergy to assume all of its obligations under the 1988 Wage Agreement, including that to the 1950 Plan, Fawn Mining could well have negotiated with the UMW with the view that a concession by it regarding the 1950 Plan would render insignificant its commitment to BethEnergy concerning that Plan. Moreover, the fact that Fawn Mining contributed to the 1974 Plan, which was the other plan specified in the Wage Agreement, evidences that Fawn Mining was not trying to shirk all obligations to contribute to a welfare or pension fund, thereby providing some support for Fawn Mining's claim that it was led to believe from the start that the 1950 Plan provision was excluded from its agreement with the UMW.

23

inadmissible under the parol evidence rule. For support, it cites Wilkes Barre Printing Pressman and Assistants' Union, No. 137 I.P.P. & A.E. v. Great Northern Press, 522 F.Supp. 106, 109 (M.D. Pa. 1981), which held that, "[o]nce the existence of a binding contract has been established, [parol evidence to challenge the stated terms of a collective bargaining agreement] will be disallowed as part of a general policy to protect workers from collusive oral agreements between management and the union leadership." The UMW also points to Lewis v. Seanor Coal, 382 F.2d 437, 441-45 (3d Cir. 1967), cert. denied, 390 U.S. 947 (1968), which held that parol evidence of oral modifications to written contractual terms is inadmissible.

The UMW's parol evidence argument is unpersuasive. While the parol evidence rule generally prohibits the admission of evidence that contradicts the terms of an integrated, unambiguous writing, the "rule does not apply to evidence introduced to show that a contract was void or voidable." Coleman v. Holecek, 542 F.2d 532, 535 (10th Cir. 1976). Therefore, "events antecedent to the making of a contract which negate mutuality of assent, such as duress or fraud, or demonstrate a condition to be fulfilled before the obligations of the contract are to vest, may also be the subject of parol evidence." 4 Walter H.E. Jaeger, Williston on Contracts § 631, at 950 (3d ed. 1961). In the case at hand, Fawn Mining has tendered evidence which it claims would show the existence of fraud in the

24

execution, thereby making the contract void.  Such evidence is not prohibited by the parol evidence rule.[0]

IV.

Finally, we turn to Fawn Mining's claim for indemnity from the UMW.  Paragraph 23 of Fawn Mining's Third Party Complaint against the UMW alleges as follows:

> 23.  Any liability of Fawn Mining to Plaintiffs for contributions allegedly due to the 1950 Benefit Plan, which is denied, is the result of the UMW and District 5's negligent or fraudulent representations which induced Fawn Mining to purchase the BethEnergy mine assets under the assumption and agreement that Fawn Mining would not be required to contribute or to otherwise participate in the 1950 Benefit Plan.

---

[0]Contrary to the UMW's assertion, the general rule that a signer of an instrument is bound by its terms regardless of whether the signer read the instrument is inapplicable here. This is so because Fawn Mining is claiming that the UMW led it to believe that the parties were signing an instrument which was completely different from that which the UMW claims Fawn Mining signed. See Gilliam, 737 F.2d at 1504 ("We recognize that a party who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it.  This proposition, however, is qualified by the principle that he who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms of the document.  For example, one who signs a promissory note reasonably believing he only gave his autograph is not liable on the note." (citations omitted)).

25

App. 77.

While Fawn Mining asserts a fraud in the execution defense to the Plans' claim against it for contribution, it here alleges, in the alternative, fraud in the inducement of its asset purchase contract with BethEnergy as a basis for an indemnity claim against the UMW in the event it is held liable to the Plans. As we have indicated, there is a material dispute of fact as to precisely what role the UMW played in the negotiations leading to Fawn Mining's acquisition of the mine facility. Based on the current record, we believe a trier of fact could choose not to credit Fawn Mining's contentions with respect to the significance of the signing of the unattached signature page and could still conclude that it was induced to sign the Asset Purchase Agreement by the UMW representation that contributions to the 1950 Plan would be waived. In that event, it seems to us that Fawn Mining could be held liable to the Plans and, at the same time, could be entitled to indemnity from the UMW for the contributions it would have to pay. Accordingly, we conclude that summary judgment for the UMW on the Third Party Complaint was inappropriate.

V.

For these reasons, we will reverse the district court's summary judgments in favor of the Plans and the UMW and remand for further proceedings consistent with this opinion.

26