**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-3791 & 19-3102
_____

MZM CONSTRUCTION COMPANY, INC.,
d/b/a MZM Construction Management & Transportation

v.

NEW JERSEY BUILDING LABORERS STATEWIDE
BENEFIT FUNDS,
                              Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2-18-cv-16328)
District Judge:  Honorable Kevin McNulty

_____

Argued June 3, 2020
_____

Before:  AMBRO, HARDIMAN, and RESTREPO, *Circuit
Judges*.

(Filed: September 14, 2020)

Bradley M. Parsons  [ARGUED]
Seth Ptasiewicz
Kroll Heineman Carton
99 Wood Avenue South
Metro Corporate Campus I, Suite 307
Iselin, NJ 08830
        *Counsel for Appellant*

Eric Magnelli        [ARGUED]
Anthony M. Rainone
Brach Eichler
101 Eisenhower Parkway
Roseland, NJ 07068
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*.

We are confronted with a "mind-bending" question that has been dubbed "the queen of all threshold issues" in arbitration law.  David Horton, *Arbitration About Arbitration*, 70 Stan. L. Rev. 363, 370, 422 (2018).  Who decides—a court or an arbitrator—whether an agreement exists, when the putative agreement includes an arbitration provision empowering an arbitrator to decide whether an agreement exists?

2

This seemingly circular and esoteric inquiry implicates important concerns, from the more specific question of whether the parties' bargained-for forum is being enforced to broader questions about the allocation of powers between judges and arbitrators. In this case, the U.S. District Court for the District of New Jersey concluded that the court had the primary power to decide whether fraud in the execution vitiated the formation or existence of the contract containing the arbitration provision. The court thus enjoined arbitration pending resolution of factual issues that bear upon that claim.

We agree. Under the Federal Arbitration Act (FAA), 9 U.S.C. § 4, questions about the "making of the agreement to arbitrate" are for the courts to decide unless the parties have clearly and unmistakably referred those issues to arbitration in a written contract whose formation is not in issue. Here, the formation of the contract containing the relevant arbitration provision is at issue. Therefore, we will affirm.

## I. BACKGROUND

### A. Events Leading up to the Arbitration Dispute

In 2001, MZM Construction Company, a New Jersey corporation, hired workers from a local labor union for a construction project at the Newark Liberty International Airport. The following year, MZM's president and sole shareholder, Marjorie Perry, signed a one-page, short-form agreement (SFA) with the union. Work on the Newark Airport project concluded in 2004.

The SFA states that, "in order to expand the work opportunities of both parties," MZM and the union "agree to be bound by the conditions as set forth in the 1999 Building,

Site and General Construction Agreement, which expires April 30, 2002," and its successor, "the 2002 Building, Site and General Construction Agreement, which successor becomes effective May 1, 2002." JA64. Both agreements are "incorporated" into the SFA "in full." *Id*. The parties refer to the agreements referenced in the SFA as collective bargaining agreements or CBAs. The SFA does not include any other substantive terms, nor does it indicate whether the CBAs were attached to it.

Under the 2002 CBA, employers are required to make contributions to the New Jersey Building Laborers' Statewide Benefit Funds in accordance with "the applicable trust agreement." JA89 (2002 CBA, art. 14.10). The 2002 CBA was to remain in effect through April 2007, when it would automatically self-renew on a "year-to-year" basis unless terminated by the contracting parties.[1] JA98 (2002 CBA art. 23.10).

From 2001 through 2018, MZM remitted more than $500,000 in contributions to the Funds for work related to the Newark Airport project, as well as several other unrelated jobs. When making those contributions, MZM executed and submitted remittance reports, several of which expressly reference "Collective Bargaining Agreements" and certain trust agreements. JA320-45, 355. Perry signed those reports in her capacity as MZM's president.

The 2002 CBA and related trust agreement give the Funds the authority to audit the books of contracting employers to validate that all required contributions have been made. In

---

[1] There is no contention that MZM has ever attempted to terminate any CBA.

4

2018, the Funds invoked this authority to ensure that contributions made by MZM from October 2014 through September 2017 "were made in accordance with collective bargaining agreements." JA361. MZM consented to and participated in the audit. Following the audit, the Funds determined that MZM owed about $230,000 in contributions for the relevant time period.

When MZM questioned the basis for the alleged liability, the Funds produced the SFA that Perry signed in 2002, along with an *unsigned* copy of the 2002 CBA.[2] The Funds further informed MZM that, absent payment, a collection dispute would be submitted to arbitration. The trust agreement gives the Funds the option of going to court or "designat[ing] a permanent arbitrator to hear and determine collection disputes." JA290 (Trust Agreement, art. V § 4).

In addition, the 2002 CBA contains an arbitration clause pursuant to which the contracting parties agree to arbitrate, among other things, "questions or grievances involving the interpretation and application of this Agreement," *i.e.*, the 2002 CBA. JA96-97 (2002 CBA, art. 21.20(b)); JA68 (2002 CBA Preamble (defining the "Agreement" as "this Collective Bargaining Agreement")). The arbitration clause includes a provision stating: "The Arbitrator shall have the authority to decide whether an Agreement exists, where that is in dispute." JA97 (2002 CBA, art. 21.20(c)).

The Funds unilaterally scheduled arbitration to begin in November 2018.

---

[2] They also produced a copy of the then-active 2016 CBA, which was also unsigned.

## B. MZM's Action in the District Court

That same month, MZM filed a complaint against the Funds in the District Court, seeking to enjoin arbitration. It also sought a declaratory judgment that MZM is not a signatory to any CBA, that MZM has no obligation to arbitrate under any CBA, and that MZM is not liable to the Funds under any CBA. The gravamen of the complaint is that fraud in the execution voided the SFA and the incorporation of the CBAs, and therefore, no agreement exists between MZM and the Funds.

In a supporting declaration submitted with the complaint, Perry admits that she signed the SFA in 2002 but claims she never intended to execute a "statewide [CBA]" requiring MZM to hire union workers and pay fringe benefits on all of its construction projects within the state. JA59 (Perry Decl. ¶ 10); *see also* JA44 (Compl. ¶ 15). According to Perry, while MZM was working on the Newark Airport project, a local union representative, Joe Taylor, approached and asked her to "sign a single-project agreement . . . because the union had nothing on record for MZM for the Newark Airport job." JA58 (Perry Decl. ¶ 9). Taylor "confirmed" that the document he needed her to sign "was only for the Newark Airport job." *Id*. "[A]t no time did . . . Taylor advise" Perry that he wanted her to sign a statewide CBA. *Id*. He said that if she did not sign the SFA, the union would pull its workers from the job. Perry "signed the one-page document to avoid any labor interruptions on the job." *Id*.

Perry avers that she relied on Taylor's characterization of the SFA when signing it. Taylor "normally dealt with [Perry] over the years," and she contends that he knew from their "many dealings" that MZM is an "open shop," *id*., meaning that MZM does not ordinarily hire workers based on

6

union affiliation and only hires union workers "from time to time," for instance, when directed to do so by a site owner or general contractor for a specific project. JA57 (Perry Decl. ¶¶ 5-6). Taylor was also aware that MZM "had no interest in becoming a party to any statewide [CBA]." JA58 (Perry Decl. ¶ 9). Perry claims she never received or even saw a copy of the 2002 CBA or any CBA until after the audit in 2018.

According to the complaint, MZM and the union's conduct during the sixteen years following the execution of the 2002 SFA did not accord with a statewide CBA but rather reflected their regular course of dealing. When MZM needed union labor because an owner or general contractor required it, the union would provide laborers and MZM would pay wages and fringe benefits to the Funds.

The Funds moved to dismiss the complaint and opposed the injunction application. They asked the District Court to refer MZM's fraud-in-the-execution claim to the arbitrator, along with the underlying collection dispute, in accordance with the 2002 CBA's arbitration provision. The Funds further asserted that MZM had not stated a claim of fraud in the execution but rather fraud in the inducement. They argued that this distinction is material to whether the court or the arbitrator decides if an enforceable contract exists. The Funds submitted evidence about the parties' alleged course of dealings that, according to the Funds, demonstrated a mutual intent to be bound by the CBAs.

In December 2018, the District Court held a hearing in which it framed the issue as follows: "The task before us . . . is to figure out whether this [dispute] stays here or goes to the arbitrator." JA422. After hearing argument, the court expressed doubt that a valid arbitration agreement existed

7

between the parties based on MZM's claim of fraud in the execution and granted a preliminary injunction to preserve the *status quo* while it resolved that claim. The District Court later entered an order enjoining arbitration during the pendency of this action. It also "denied" the motion to dismiss "because the arbitrability issue cannot be decided without further factual development." JA7. The court authorized "expedited discovery." JA7. The Funds timely appealed from that order.

While that appeal was pending, the Funds moved the District Court for reconsideration under Rules 54(b) and 60(b) and for an indicative ruling under Rule 62.1, which authorizes a district court to rule on motions that are barred pending appeal. The Funds asked the court to indicate that, if the case were remanded, it would enforce the arbitration agreement based on newly discovered evidence showing that, in 1999, Perry had signed an earlier SFA that expressly incorporated the predecessor to the 2002 CBA. The Funds argued that this new evidence further demonstrated that Perry understood what she was signing in 2002 and intended to be bound by the CBA and its arbitration provision.

In August 2019, the District Court denied the motion. It determined that, despite the production of the 1999 SFA, there were still "several disputed facts that suggest that the parties did not intend to incorporate the CBA."[3] JA31. The court elucidated its reasoning for refusing to compel arbitration, noting that there was a presumption that issues of "arbitrability" are for the court to decide and that to "overcome

---

[3] The opinion is reported at *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers' Statewide Benefit Funds*, No. 18-16328, 2019 WL 3812889 (D.N.J. Aug. 14, 2019).

8

this presumption, an arbitration clause must contain clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." JA21 (internal quotation marks, alterations, and citations omitted). The court concluded that the 2002 CBA's arbitration provision—empowering the arbitrator to decide whether an agreement exists—was not "sufficient to send the matter to an arbitrator where a party legitimately disputes whether it ever saw, heard about, or agreed to a CBA at all, and where it even disputes the scope of the SFA that supposedly incorporated the CBA." JA32 (Op. 25 n.8).

The Funds timely appealed that decision, and we consolidated both of their appeals.[4]

## II. STANDARD OF REVIEW

The District Court treated "the injunction application" as "the functional equivalent of an opposition to a motion to compel arbitration by the Funds." JA8. We agree.

---

[4] This dispute arises out of a putative contract between an employer and a labor union under the Labor Management Relations Act (LMRA), 29 U.S.C § 141, *et seq.*, pursuant to which a contracting employer is required to make certain contributions to benefit funds established under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*. The District Court had jurisdiction under 28 U.S.C. § 1331, as well as under the LMRA, 29 U.S.C. § 185(a), and ERISA, 29 U.S.C. § 1132(e). We have jurisdiction under 28 U.S.C. § 1292(a)(1) because the Funds appeal from an order enjoining arbitration. *Nat'l Football League Players' Concussion Injury Litig.*, 923 F.3d 96, 107 (3d Cir. 2019).

9

The combined effect of the District Court's decision to enjoin arbitration, deny the motion to dismiss, and require the Funds to litigate the arbitrability issue, *i.e.*, the fraud-in-the-execution claim, was to deny the Funds' asserted right to have that issue submitted to arbitration. *See Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 599 (3d Cir. 2020) (stating, for jurisdictional purposes, that the FAA makes no distinction between an order denying arbitration and final orders "that accomplish the same end" (internal quotation marks omitted)). As such, we may exercise plenary review and "affirm on any grounds supported by the record."[5] *Id*. at 599 n.5.

In reviewing a district court's refusal to compel arbitration at the pleadings stage, we accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the party opposing arbitration. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013). In addition to the complaint, we may consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents[.]" *Id.* (citation omitted).

### III. DISCUSSION

The critical question in this appeal is who decides MZM's contract defense, *i.e.*, its claim that it never intended to execute an SFA incorporating statewide CBAs with an

---

[5] MZM urges us to apply an abuse of discretion standard, because the order appealed from involves an injunction. Even if we did, our analysis would not change. This appeal raises purely legal questions that are subject to *de novo* review. *Bennington Foods LLC v. St. Croix Renaissance, Group, LLP*, 528 F.3d 176, 178 (3d Cir. 2008).

arbitration provision but rather intended to execute a single-project agreement with no mention of arbitration. As explained more fully below, the answer to that question is bound up with the determination of whether MZM's claim sounds in fraud in the execution, which voids a contract as if it had never been executed, or fraud in the inducement, which presumes the existence of a contract but renders it voidable.

The District Court has not yet ruled on the merits of MZM's claim. Rather, it made three antecedent rulings: (i) the court has the primary power to decide questions about the formation of an arbitration agreement (ii) MZM put the formation of the relevant arbitration agreement in issue by stating a claim of fraud in the execution, and (iii) genuine issues of fact need to be explored in discovery before resolving that claim. The Funds challenge all three rulings, so we address each in turn.

## A. The District Court's Power

The threshold issue is whether the District Court has the power to resolve questions about the formation or existence of a contract when the putative contract includes a provision delegating "the authority to decide whether an Agreement exists" to the arbitrator. JA97 (2002 CBA, art. 21.20(c)).

### 1. The FAA's Pro-Arbitration Policy and the Severability Doctrine

We begin with the FAA, the federal statute that guides our analysis of arbitration agreements in contracts governed by

11

federal labor law.[6] "The FAA establishes a strong federal policy in favor of compelling arbitration over litigation." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 104 (3d Cir. 2000); *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) (noting that "Congress enacted the FAA to replace judicial indisposition to arbitration with a national policy favoring it" (internal quotation marks and alteration omitted)); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001) (explaining that "the FAA was a response to hostility of American courts to the enforcement of arbitration agreements").

---

[6] The District Court treated the CBA's arbitration provision as if it were governed by the FAA, a premise that the parties accept. We proceed under the same premise. Although the FAA applies to commercial arbitration agreements by its own terms, it is well-accepted that labor arbitration disputes arising under federal law should be resolved in accordance with the FAA, even though labor arbitration agreements may not be technically governed by the statute. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298-99 & n.6 (2010) (applying FAA cases to a CBA's arbitration provision, "because they employ the same rules of arbitrability that govern labor cases"); *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 41 (1987) (noting that "federal courts have often looked to the [FAA] for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the [LMRA], 29 U.S.C. § 185, empowers the federal courts to fashion rules of federal common law to govern [s]uits for violation of contracts between an employer and a labor organization under the federal labor laws" (internal quotation marks and citations omitted)(second alteration in original)).

12

Following the enactment of the FAA, the Supreme Court has steadily advanced this policy by guarding against unwarranted judicial interference with arbitration. *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (holding that courts cannot decide arbitrability issues that the parties agreed to submit to arbitration even if "the argument for arbitration is wholly groundless"); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967) (holding that arbitrators have the primary power to decide legal issues relating to the parties' contract absent evidence indicating the parties intended to exclude those issues from arbitration).

Of relevance here is the Supreme Court's decision in *Prima Paint*, which established what is known as the "severability doctrine." *Sandvik*, 220 F.3d at 105 (citing *Prima Paint*, 388 U.S. at 404). After looking at the FAA's text and structure, in particular sections 2, 3 and 4, the Court held that an arbitration clause is "severable" and independently enforceable from the rest of the contract in which it is contained. *Id.*; *see Prima Paint*, 388 U.S. at 400, 403-04. Under this severability rule, a party cannot avoid arbitration by attacking the contract containing the arbitration clause as a whole (the "container contract"). Rather, the party opposing arbitration must challenge "the arbitration clause itself." *Prima Paint*, 388 U.S. at 403.

For instance, a claim of fraud in the inducement *of the arbitration clause* is for the court to decide, but a claim of fraud in the inducement *of the container contract* is for the arbitrator. *Id.* at 403-04. Because the party opposing arbitration had only alleged fraud in the inducement of the container contract, the *Prima Paint* Court referred that issue to the arbitrators in accordance with the arbitration clause. Thus, under *Prima*

13

*Paint*, absent a specific challenge to the validity of the arbitration clause specifically, the court must treat it as a valid and enforceable agreement and refer any challenges to the container contract to arbitration. *Id.* at 406.

### 2. The FAA Requires a Court to Be Satisfied that an Agreement Was Made

*Prima Paint* did not address whether the severability doctrine applies in cases where the formation of the container contract is at issue. But the Supreme Court has made clear that the "liberal federal policy favoring arbitration agreements," which underpins the severability doctrine, "is at bottom a policy guaranteeing the enforcement of private contractual arrangements." *Sandvik*, 220 F.3d at 105 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 (1985)) (quotation marks and citation omitted). Simply put, without an *agreement* to arbitrate, there can be no arbitration. *Id*. at 105, 107-08; *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980).

So, who decides whether an arbitration agreement exists when the formation or the existence of the container contract is disputed—the court or the arbitrator?

We answered that question in *Sandvik*. There, we turned to section 4 of the FAA, which provides that a federal court must compel arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue," 9 U.S.C. § 4, and we held that this provision "affirmatively requires" a court to decide questions about the formation or

14

existence of an arbitration agreement, namely the element of mutual assent.[7]  *Sandvik*, 220 F.3d at 108-09.

The court must resolve those questions even when the answer requires passing judgment on the formation or existence of the container contract, because "the doctrine of severability presumes an underlying, existent, agreement."  *Id*. at 106 ("[T]hough arbitration clauses are severable from their larger contracts, the question whether the underlying contract

---

[7] The formalities of contract formation also require adequate consideration.  We read *Sandvik* as being limited only to claims that, if proven, would negate the element of mutual assent.  If mutual assent is undisputed, a claim that the container contract alone lacks consideration would not be enough to put the formation or existence of the arbitration agreement in issue.  The severability doctrine presumes that the mutual promise to arbitrate is sufficient consideration to sustain an arbitration agreement separate and apart from the container contract.  *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002) ("When both parties have agreed to be bound by arbitration, adequate consideration exists and the arbitration agreement should be enforced."); *Sandvik*, 220 F.3d at 108 (citing *Sauer-Getriebe KG v. White Hydraulics,* 715 F.2d 348, 350 (7th Cir.1983) ("The agreement to arbitrate and the agreement to buy and sell . . . are separate.  [Plaintiff's] promise to arbitrate was given in exchange for [defendant's] promise to arbitrate and each promise was sufficient consideration for the other." (alterations supplied)); *see also, e.g., Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 422-26 (E.D. Pa. 2016).

contains a valid arbitration clause still precedes all others.").[8]
We explained that this threshold determination is "a necessary
prerequisite" in fulfilling the court's gatekeeping function. *Id*.
at 107. Otherwise, arbitrators would be allowed "to determine
their own jurisdiction, something that is not permitted in the
federal jurisprudence of arbitration[.]" *Id*. at 111.

### 3. *The Contractual Delegation of Powers to Arbitrators*

In *Sandvik*, we also noted that, under Supreme Court
precedent, contracting parties are free to refer arbitrability
questions to arbitration, including "disputes of the nature
before us today[.]" *Id.* 111. In other words, parties may
contractually bestow upon arbitrators the power to decide their
own jurisdiction, *id*., a well-established arbitration principle
known as competence-competence or arbitrating arbitrability.[9]

---

[8] In *Par-Knit*, we held that the party opposing arbitration
could not be bound by an arbitration provision before the court
determined if the signatory had authority to bind the company
to the container contract, but we did not address the
implications of the severability doctrine. 636 F.2d at 54-55.

[9] The concept of "arbitrability" encompasses all sorts of
"gateway" issues regarding the parties' obligation to arbitrate,
"such as whether the parties have agreed to arbitrate or whether
their [arbitration] agreement covers a particular controversy."
*Henry Schein*, 139 S. Ct. 524, 529 (2019) (citation omitted);
*see also Singh v. Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir.
2019) ("To the extent that a particular ground implicates the
threshold question of *whether the parties are bound by an
agreement to arbitrate*, it is referred to as a gateway question
of arbitrability." (emphasis added)).

*See China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 281, 287 (3d Cir. 2003); *see also Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 849-50 (6th Cir. 2020).

We also emphasized the Supreme Court's admonition that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so." *Sandvik*, 220 F.3d at 111 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)) (alterations supplied); *see also AT & T Techs., Inc. v. Commc'ns Workers,* 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

Since our decision in *Sandvik*, the Supreme Court has further addressed the procedures for determining who decides "gateway questions of arbitrability." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) (internal quotation marks and citation omitted). In *Rent-A-Center*, the Court recognized that contracting parties can agree that arbitrators, not courts, shall resolve arbitrability issues by including in the contract a so-called "delegation provision" conferring upon the arbitrators the "exclusive authority" to decide those gateway matters. 561 U.S. at 68-69, 71. The Court held that, under the FAA, a delegation provision is itself "an additional, antecedent [arbitration] agreement." *Id*. at 70. Think of a delegation provision as a mini-arbitration agreement within a broader arbitration agreement within a broader contract, "something akin to Russian nesting dolls." *Id.* at 85 (Stevens, J., dissenting); *see* 1 Domke on Com. Arb. § 15:11.50 ("The goal of delegation is to insulate and protect the arbitration process,

preventing the parties from wasting time and money fighting in court before going to arbitration.").

The *Rent-A-Center* Court explained that the FAA operates on the delegation provision as it does on any other arbitration agreement. 561 U.S. at 70. Thus, consistent with the severability doctrine, unless the party opposing arbitration challenges "the delegation provision specifically," the district court "must treat it as valid" and "must enforce it" by sending "any challenge to the validity" of the underlying *arbitration agreement* to the arbitrator. *Id*. at 72.

Even when the grounds for invalidating the delegation provision and the underlying agreement are the same, the arbitrability challenge must still be directed at the delegation provision specifically to invoke a court's power to intervene. *Id*. at 71. The Court thus concluded that, because the party opposing arbitration failed to direct its unconscionability challenge at the delegation provision, it was for the arbitrator to resolve that gateway issue. *Id*. at 72 (observing that "[n]owhere in his opposition" in the district court "did [the plaintiff] even mention the delegation provision"); *see MacDonald v. CashCall, Inc*., 883 F.3d 220, 227 (3d Cir. 2018) ("[W]ithout a specific challenge to a delegation provision, the court must treat that provision as valid and enforce it according to FAA § 4[.]").

### 4. Application to this Case: The Intersection Between the Severability Doctrine and the Delegation of Contract Formation Disputes

So, what happens when, as here, the container contract, whose formation or existence is being challenged, has a delegation provision empowering the arbitrator to decide

18

whether an agreement exists?  Who decides the threshold issue then?

The Funds point out that MZM attacked the validity of the SFA and CBA (the container contract) and the CBA's arbitration provision (the broader arbitration agreement) but failed to direct its challenge specifically at the delegation provision (the agreement to arbitrate arbitrability).  According to the Funds, absent any allegation that the delegation provision itself is invalid as required under *Rent-A-Center* and *MacDonald*, the District Court was obligated to enforce it—no questions asked.

That argument has some appeal.  After all, Perry admits that she intended to enter into some sort of agreement with the union when she signed the SFA, which expressly incorporates the 2002 CBA "in full."  JA64.  And MZM does not argue that the terms of the SFA alone are ineffective for incorporating the CBAs.  Thus, on the face of these documents, the delegation provision seems to be a valid agreement to arbitrate the existence of the CBA.  Without any allegation or argument indicating why the delegation provision itself is defective, the court is left to connect the dots on its own, something that *Rent-A-Center* seems to forbid.  *See* Restatement (Third) of the U.S. Law of Int'l Comm. Arb. § 2-12 & com. c (Tentative Draft No. 4, 2015) ("[T]here may be circumstances in which, pursuant to the separability doctrine, a court finds that an arbitration agreement came into existence even though the contract in which it is found may not have."); George A. Bermann, *The Supreme Court Trilogy and Its Impact on U.S. Arbitration Law*, 22 Am. Rev. Int'l Arb. 551, 557-58 (2011) ("[E]ven a party that steadfastly insists that it is a stranger to an agreement may, by virtue of clear and unmistakable language in the

19

contract, find itself having given a tribunal primary authority to answer that very question.").

MZM sees things differently. It believes that *Rent-A-Center* and *MacDonald* apply only when a party challenges the validity or enforceability of an *existing* agreement, not when, as here, the formation or existence of the entire agreement is in issue.

Reduced to its essence, the parties' dispute sits at the intersection of the severability doctrine as articulated in *Rent-A-Center*, which requires that an unchallenged delegation provision in a disputed contract be enforced as presumptively valid, and section 4 of the FAA, which, as construed in *Sandvik*, 220 F.3d at 109, "affirmatively requires" a court to rule on the formation of the container contract.

Although the Third Circuit has not since *Rent-A-Center* squarely addressed this issue, we believe that our decision in *Sandvik* compels the same outcome here. Recall that, in *Sandvik*, we expressly rejected the argument that the severability doctrine applies when the threshold arbitrability issue is whether the parties mutually assented to the container contract. 220 F.3d at 101, 106, 108. For good reason: Lack of assent to the container contract necessarily implicates the status of the arbitration agreement, when the container contract and the arbitration provision depend on the same act for their legal effect. *Id.* at 109, 111. It is thus inevitable that a court will need to decide questions about the parties' mutual assent to the container contract to satisfy itself that an arbitration agreement exists and *vice versa*. That is no less true when the container contract includes or incorporates a delegation provision. *See China Minmetals*, 334 F.3d at 288 ("[A] contract cannot give an arbitral body any power, much less the

20

power to determine its own jurisdiction, if the parties never entered into it."). Given that *Rent-A-Center* made clear that the FAA operates on the delegation provision as it does on any other arbitration agreement, we see no reason to deviate from our analysis in *Sandvik*, and we conclude that the degree of specificity required in *Rent-A-Center* does not apply here.[10]

We find further support for this view in the Supreme Court's arbitrability jurisprudence. In *Rent-A-Center* itself, the Court drew a distinction between, on the one hand, questions about the validity or enforceability of an arbitration provision in an existing contract and, on the other hand, questions about whether an agreement "was ever concluded" in the first place. 561 U.S. at 70 n.2 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)). The Court emphasized that it was only addressing the former, *id.*, perhaps implying that its decision did not apply to the latter. In *Granite Rock*, the Court again suggested that questions about contract formation are different, and listed arbitrability issues that a "court *must* resolve" before referring a matter to arbitration, which "*always* include whether the [arbitration] clause was agreed to." 561 U.S. at 297 (emphases added); *see also Henry*

---

[10] We note that MZM directed its fraud in the execution challenge at the SFA incorporating the CBAs and, on that basis, disputed any agreement to arbitrate under the CBA's arbitration provision. It never mentioned the "delegation provision" specifically by name or even cited the relevant subpart. Though this was enough to put the Funds on notice that MZM was challenging the formation or existence of any arbitration agreement predicated on the execution of the SFA, we think it prudent for parties to always be as precise as possible when stating their claim to avoid any pitfalls.

21

*Schein*, 139 S. Ct. at 530 ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.").

To be sure, none of those cases, or any other Supreme Court case for that matter, dealt with a contract-formation dispute involving a delegation provision assigning that task to the arbitrator, so this precise situation remains an open question. While in this Court we are bound by *Sandvik*, we do not follow it blindly. Whether and how *Sandvik* applies here is a thorny issue post-*Rent-A-Center*, and one that could reasonably go either way depending on how one weighs the FAA's competing policies.

No matter how this question is resolved, there is a risk that one of the parties will be denied the full benefit of its bargain or the forum to which it is entitled. If the court were allowed to intervene at the outset and ultimately conclude that a validly formed agreement exists, the Funds will have been theoretically denied the contractual right to have that issue resolved by the arbitrator in the first instance and will have been subjected to litigation inconveniences that they were seeking to avoid by bargaining for a delegation provision. Inversely, if the court enforces the delegation provision without first considering the existence of the container contract, and the arbitrator later concludes that no agreement ever existed, then MZM will have been compelled to arbitrate a matter it never agreed to and will have been denied a judicial forum in the process.

We weighed those concerns in *Sandvik*, 220 F.3d at 111, and we weigh them today in light of *Rent-A-Center* and its progeny. Consistent with the Supreme Court's repeated admonition that, at its core, "arbitration is a matter of contract,"

22

*Rent-A-Center*, 561 U.S. at 67, 69, we believe that the text of section 4 of the FAA—mandating that the court be "satisfied" that an arbitration agreement exists—tilts the scale in favor of a judicial forum when a party rightfully resists arbitration on grounds that it never agreed to arbitrate at all. Indeed, it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide the existence of an arbitration agreement when one of the parties has put the existence of that very agreement in dispute. *See Rent-A-Center*, 561 U.S. at 69 n.1 (noting that the "'clear and unmistakable' requirement . . . pertains to the parties' *manifestation of intent*") (citation omitted)).

We are not alone in reaching this conclusion. After *Rent-A-Center*, several sister circuits have confronted this same threshold question and have declined to enforce delegation provisions when the formation or existence of the container contract was at issue. *See In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 385-86 (6th Cir. 2020); *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019); *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 515 (5th Cir. 2019); *Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741 & n.2 (8th Cir. 2014).[11] We join these circuits in adopting the view that, under section 4 of the FAA, courts retain the primary power to decide questions of whether the parties mutually assented to a contract containing or incorporating a delegation provision.

---

[11] District courts in the Seventh Circuit have adopted this position as well. *See*, *e.g.*, *CCC Info. Servs. Inc. v. Tractable Inc.*, No. 18 C 7246, 2019 WL 2011092, at *2 (N.D. Ill. May 7, 2019), *appeal pending*, No. 19-1997 (7th Cir.).

We conclude our analysis of this threshold question by echoing *Sandvik*'s disclaimer that nothing in our decision today precludes parties from delegating issues of contract formation like the one before us. 220 F.3d at 111. But we caution that the legal effect of the delegation must come from an "independent source" outside the contract whose formation or existence is being disputed. *Id.* at 108. For instance, parties can enter into pre-negotiation contracts in which they agree to arbitrate all arbitrability issues pertaining to future contracts between them. *See id.* at 111-12. Or, once a dispute has arisen, they can agree by stipulation to submit their entire dispute to arbitration, including any gateway issues regarding the formation of the original contract containing the delegation provision. *See* Restatement (Third) of the U.S. Law of Int'l Comm. Arb. § 2-12(b) & com. d (Tentative Draft No. 4, 2015). Even then, the arbitrators' determination as to whether the parties agreed to arbitrate in the first place will be reviewable *de novo* by a court of competent jurisdiction on the backend if the arbitrators render an award in the absence of a validly existing arbitration agreement over a party's objection. *China Minmetals*, 334 F.3d at 288-89.

In brief, we reaffirm our decision in *Sandvik* and hold that, unless the parties clearly and unmistakably agreed to arbitrate questions of contract formation in a contract whose formation is not in issue, those gateway questions are for the courts to decide.

## B. Fraud in the Execution

The next question then is whether MZM has put the formation of the arbitration agreement "in issue" by stating a claim of fraud in the execution. To state a claim, MZM must plead specific factual matter in line with that legal standard.

24

Under the FAA, agreements to arbitrate must be treated like "all other contracts." *Buckeye Check Cashing*, 546 U.S. at 443. When determining whether an arbitration agreement exists, we "apply ordinary state-law principles" governing contract formation. *James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017) (quoting *First Options*, 514 U.S. at 944). The District Court applied New Jersey law, and the parties do not dispute that decision.

Under New Jersey law, "[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law." *Id.* at 265 (quoting *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 312-13 (N.J. 2014) (internal quotation marks omitted)). Here, the existence of an arbitration agreement comes into play because the SFA purports to incorporate the full terms of an unattached and *unsigned* CBA with an arbitration provision.

New Jersey law allows unsigned documents to be incorporated by reference. However, for the incorporation to be effective, "the separate document must be described in such terms that its identity may be ascertained beyond doubt and . . . the party to be bound by the terms must have had knowledge of and assented to the incorporated terms." *Bacon*, 959 F.3d at 600 (quoting *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 983 A.2d 604, 617 (N.J. Sup. Ct. 2009)) (internal quotation marks omitted). It is undisputed that the SFA describes the incorporated agreements with enough detail to identify them as the CBAs. The point of contention is whether Perry had "knowledge of and assented to" the essential terms in those documents. *Id.*

"It is the general rule that where a party affixes [her] signature to a written instrument, . . . a conclusive presumption

25

arises that [she] read, understood and assented to its terms and [she] will not be heard to complain that [she] did not comprehend the effect of [her] act in signing." *Peter W. Kero, Inc. v. Terminal Const. Corp.*, 78 A.2d 814, 817 (N.J. 1951); *see Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875))). Indeed, if all it took to avoid a signed contract was to claim ignorance of its content or legal effect, "contracts would not be worth the paper on which they are written." *Upton*, 91 U.S. at 50; *see Novitsky v. Am. Consulting Engineers, L.L.C.*, 196 F.3d 699, 702 (7th Cir. 1999).

It is undisputed that Perry signed the SFA in 2002. Her signature thus creates a presumption that she "read, understood, and assented to" the terms of that document. *Kero*, 78 A.2d at 817. Considering that the single sentence in the SFA does nothing more than incorporate the longer-form CBAs, it is difficult to conceive how Perry would not have understood that all the essential terms of her agreement with the union were to be found in the separately incorporated documents and that, by virtue of signing the SFA, she was agreeing to be bound by those terms. However, Perry avers that she signed the SFA "without knowledge or a reasonable opportunity to obtain knowledge of its character or its essential terms." JA53 (Compl. ¶ 87).

Perry never asked to see the incorporated agreements. Nor does she contend that, had she asked, she would have been refused. Had Perry requested and studied those documents, she could have easily identified the alleged error, and "this entire dispute could have been averted." *Central Pennsylvania*

*Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098, 1108 (3d Cir. 1996) (rejecting fraud-in-the-execution claim where employer failed to read the contract despite having opportunities to do so). Her failure to read is not by itself sufficient to avoid the legal effects of her signature, especially given her extensive business training and nearly thirty-year experience running a construction company for high-profile projects. *See Sheet Metal Workers Int'l. Ass'n Local Union No.27, AFL-CIO v. E.P. Donnelly, Inc.*, 673 F. Supp. 2d 313, 328 & n.23 (D.N.J. 2009) ("Walking blindfolded through one's business affairs does not excuse the ensuing collision." (citing *Novitsky,* 196 F.3d at 702)).

But that is not the end of the inquiry. There is an exception to this general rule when a party's "signature is obtained by fraud or imposition in the execution of the instrument." *Kero*, 78 A.2d at 817 (citations omitted). Fraud in the execution (or fraud in the factum) occurs when a party is compelled to sign the instrument "by reason of a misrepresentation intended to deceive [her] as to its purport or content[.]" *Id*. at 817-18. Because this rule is intended to protect both "the unwary and foolish as well as the vigilant," the signer's negligence in failing to read the instrument or "in trusting a representation" does not excuse the other party's intentional fraudulent act. *Id*. at 818. "This is particularly true where a relation of natural trust and confidence, though not strictly a fiduciary relation, exists between the [contracting] parties." *Id*. at 818 (citing 5 Williston on Contracts § 1516 (rev. ed. 1937)).

Fraud in the execution may also be present "when a party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms" by reason of "excusable ignorance."

27

*Connors v. Fawn Min. Corp.*, 30 F.3d 483, 490, 491 (3d Cir. 1994) (applying the Uniform Commercial Code in a labor case arising out of the LMRA and ERISA) (quotation marks omitted); *see also* Restatement (Second) of Contracts § 163 (1981). Although excusable ignorance does not require an affirmative intent to defraud, it typically involves some sort of misconduct or imposition that cuts off the signer's opportunity to read, such as "significant time pressure" and reliance on an erroneous "assurance" that the parties' oral understanding had been or would be accurately memorialized in an instrument. *Connors*, 30 F.3d at 488, 492-93. In short, "[f]ailing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading." *New Gold Equities Corp. v. Jaffe Spindler Co.*, 181 A.3d 1050, 1064 (N.J. Super. Ct. 2018) (citation omitted).

The complaint does not explicitly allege an intent to defraud or mislead. And at oral argument, MZM disavowed that it was asserting a claim of willful fraud or "bait and switch." Oral Arg. Audio 43:45-44:45. Rather, MZM claims that Perry signed the SFA incorporating statewide CBAs with an arbitration provision in reliance on Taylor's assurance that it was a single-project agreement without any mention of arbitration. Contracting parties have a right to trust each other to draw up paperwork that accurately memorializes "the oral understanding between them," and the "presentation of the paper for signature is in itself a representation that the terms of such oral agreement have been or will be embodied in the writing." *Kero*, 78 A.2d at 818; *see also Connors*, 30 F.3d at 493 (concluding that fraud in the execution occurs where a party "surreptitiously substitutes a materially different contract" before or after the counterparty signs).

28

According to Perry, Taylor "confirmed" that the document he needed her to sign "was only for the Newark Airport job," and "at no time did . . . Taylor advise her" that he wanted her to agree to statewide CBAs. JA58 (Perry Decl. ¶ 9). And there is no indication that they discussed arbitration. We can infer from these allegations that Perry and Taylor reached an oral understanding on a single-project agreement with no mention of an arbitration provision and that Taylor assured Perry that the SFA reflected that understanding. Yet Taylor presented her with an SFA that was "materially different" insofar as it incorporated statewide, self-renewing CBAs with an arbitration provision. *Connors*, 30 F.3d at 493.

Perry alleges that Taylor never provided her copies of the incorporated agreements. Nor did she ask for them. These facts cut both ways, because they can suggest an effort on the part of Taylor to keep those documents from Perry or something less nefarious such as the parties' common failure to act diligently. We view these allegations in favor of MZM, as we must at this stage. Moreover, Perry alleges that she had good reason to trust and rely on Taylor's representation because, after having dealt with him for many years, he knew and understood that MZM was an open shop and was not interested in entering into any statewide CBA with or without an arbitration provision.

It bears noting that the complaint seems to allege that the union did not intend to enter into statewide CBAs. If so, this could be a simple case of mutual mistake. But that is not the only plausible reading of the complaint. Viewed in the light most favorable to MZM, the allegations also raise a reasonable suspicion that this was something more than an innocent mistake. Perry alleges that she felt a sense of urgency to sign the SFA because Taylor came to the work site and indicated

29

that the union would pull workers from the job if she refused to sign.

The threat of halting construction could heighten a reasonable person's sense of urgency to sign the SFA on the spot, as any disruptions on a project that had been underway for more than a year could lead to unwanted delays and higher costs. Indeed, Perry claims she signed the SFA "to avoid any labor interruptions on the job." JA58 (Perry Decl. ¶ 9). We can infer from these allegations that Taylor intentionally pressured Perry or created an undue imposition that, combined with Perry's reasonable reliance in his assurance, effectively foreclosed any opportunity to review the incorporated agreements before signing the SFA. And once it was signed, everyone went about their business.

These allegations are enough to state a claim for fraud in the execution of the SFA by reason of excusable ignorance. Without a validly executed SFA, there could be no incorporation of the CBAs, and without validly incorporated CBAs, there could be no arbitration agreement.

The Funds concede that fraud in the execution negates mutual assent, *Connors*, 30 F.3d at 493, and that such a claim belongs in court under *Sandvik*. To avoid that outcome, the Funds astutely argue that MZM has not pleaded fraud in the execution but rather fraud in the inducement.[12]

---

[12] The Funds also raise this argument to dispute that MZM has mounted a proper defense under ERISA. That issue goes to the merits of the underlying dispute, which is not currently before us. At this stage, our concern is only whether MZM has put the agreement to arbitrate in issue. *See AT & T*,

Fraud in the inducement occurs when someone signs the document they intended to sign, but their assent was induced by a material misrepresentation about facts external to that document. *See Sandvik*, 220 F.3d at 109; 37 Am. Jur. 2d Fraud and Deceit § 2 (2020). For example, if a party misrepresents that the price of cheese will increase to induce someone into signing a contract to buy milk in bulk, that is fraud in the inducement. But if a party assures its counterparty that it is signing a contract for cheese when it is in fact a contract for milk, that is fraud in the execution. *See Connors*, 30 F.3d at 490 ("[Fraud in the inducement] induces a party to assent to something he otherwise would not have; [fraud in the execution] induces a party to believe the nature of his act is something entirely different than it actually is." (quoting *Southwest Adm'r, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986)).

Again, the difference between those claims matters because, unlike fraud in the execution, which renders the entire agreement "void *ab initio*" as if it never existed, fraud in the inducement only renders the contract "voidable," giving the defrauded party the option of rescinding the contract or claiming damages for deceit. *See Sandvik*, 220 F.3d at 107, 109-10. Thus, unless MZM were alleging fraud in the inducement of the delegation provision, the District Court would be required to submit the claim to the arbitrator pursuant

---

475 U.S. at 649 ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.").

31

to the 2002 CBA's arbitration provision under *Sandvik* and *Rent-A-Center*.[13]

MZM does not claim fraud in the inducement. Nowhere does the complaint allege that Perry intended to assent to a statewide CBA with an arbitration provision. It alleges the opposite. *See* JA48 (Compl. ¶ 47) ("The only conceivable basis for the Funds to compel MZM to arbitrate any dispute would be for MZM to have agreed to a New Jersey statewide [CBA] *with an arbitration provision, which MZM never did*." (emphasis added)). Contrary to the Funds' assertion, Perry does not allege that Taylor "offered assurances that, *whatever the document might say*, the parties had actually entered into a more limited agreement." Appellant's Br. 45 (emphasis added). MZM's contention is that Perry relied on Taylor's confirmation that the documents reflected their oral understanding when in fact it was something "radically different." JA50, 53 (Compl. ¶¶ 58, 88).

Because MZM stated a claim of fraud in the execution of the container contract, MZM put the formation of the delegation provision in issue and thus triggered the District Court's power to adjudicate that claim.

---

[13] The complaint does not contest the Funds' contractual right to invoke the terms of the 2002 CBA's arbitration provision if it were binding on the parties, even though the Funds did not sign the CBA and it provides that "[o]nly the Union or the Association may submit a dispute to arbitration" under that agreement. JA97 (2002 CBA art. 21.20(b)). MZM raised this issue for the first time at oral argument before this Court—too late for us to consider it. That argument is thus forfeited.

### C. Standard of Review Applied by the District Court

The final question is whether the District Court erred by ordering limited discovery rather than compelling arbitration of the arbitrability issue on the face of the complaint.

Under our decision in *Guidotti*, when it is clear on the face of the complaint that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement, a district court must compel arbitration under a Rule 12(b)(6) pleading standard "without discovery's delay." 716 F.3d at 776 (quotation marks and citation omitted). But if the complaint states a claim or the parties come forward with facts that put the formation of the arbitration agreement in issue, the court may authorize "limited discovery" to resolve that narrow issue for purposes of deciding whether to submit the matter to arbitration. *Id*. After discovery, the court may consider the question anew, using a summary judgment standard under Rule 56. *Id*. If a genuine issue of material fact remains, the court must proceed summarily to trial on "the making of the arbitration agreement." *Id*. (citing 9 U.S.C. § 4). In following these procedures, courts must balance the FAA's competing interests in moving arbitrable claims speedily and efficiently into arbitration and in ensuring that the parties have in fact agreed to arbitrate. *See id*. at 773.

The Funds contend that the District Court erred in applying a Rule 56 summary judgment standard, rather than a Rule 12(b)(6) standard, when it refused to compel arbitration of the gateway arbitrability issue, *i.e.*, the claim of fraud in the execution. They believe that if the District Court had applied a Rule 12(b)(6) standard, the court would have been required

33

to enforce the delegation provision as valid on its face and submit that claim to the arbitrator.[14]  Not so.

While the District Court did not specify the standard that it applied when it decided to deny arbitration of the arbitrability issue, there is enough in the record to deduce that it complied with the procedures and standards set forth in *Guidotti*.  At the injunction hearing, the court noted that, following discovery, the arbitrability issue would be resolved "on a summary judgment standard" or tried if necessary.  JA459.  In its subsequent opinion denying the motion for reconsideration, the District Court elaborated on its earlier decision, stating that the preliminary injunction "consist[ed] of little more than obedience to the Third Circuit's command that arbitration cannot be ordered unless and until antecedent questions of fact are resolved."  JA8-9 (citing *Guidotti*, 716 F.3d at 771).  The court also stated that "[w]hen the issue of arbitrability is not apparent on the face of the complaint," a court may authorize discovery.  JA22.

We understand the District Court to mean that it reviewed the arbitrability issue "on the face of the complaint," *i.e.*, under a Rule 12(b)(6) standard, before denying the motion to dismiss and subjecting the parties to limited discovery.  Otherwise, by its own logic, there would have been no reason to subject the parties to discovery.  We also take the District

---

[14]  The Funds take issue with the District Court's decision to consider extrinsic evidence in determining whether the SFA and CBA were validly formed.  We see no error.  Under New Jersey law, parol evidence is admissible to show fraud in the execution.  *Kero*, 78 A.2d at 818; *see also Connors*, 30 F.3d at 493-94.

Court at its word that it will apply a summary judgment standard after limited discovery is complete, not that it has already applied that standard. At that time, all relevant evidence that the parties have submitted to date, including the 1999 SFA, as well as any additional evidence gathered through expedited discovery, may be put forward on a motion for summary judgment.

While it would have been preferable for the District Court to have explicitly reviewed the sufficiency of the pleadings on the record before refusing to compel arbitration on the arbitrability issue, that omission was harmless. As explained in section III.B above, MZM has sufficiently alleged fraud in the execution of the container contract, putting the formation of the arbitration agreement in issue. Therefore, the Funds were not entitled to have that gateway arbitrability claim submitted to arbitration on the face of the complaint.[15]

## IV. CONCLUSION

For these reasons, we will affirm the District Court decision.

---

[15] Given the FAA's interests in resolving arbitrability issues speedily and efficiently, we have undertaken to review the sufficiency of the pleadings ourselves rather than remand for that purpose. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 29 (1983). Furthermore, we would not be able to meaningfully review and affirm the District Court's refusal to compel arbitration of the arbitrability issue without satisfying ourselves that MZM stated a claim of fraud in the execution, not fraud in the inducement.